587 So.2d 228 (1991)
ATTORNEY Q
v.
MISSISSIPPI STATE BAR.
No. 89-BA-0596.
Supreme Court of Mississippi.
September 11, 1991.
Rehearing Denied November 6, 1991.
*229 Richard Barrett, Learned, for appellant.
Michael B. Martz, Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This is a Bar disciplinary matter, wherein we are required to scrutinize a lawyer's contacts with and advice to the adverse party to a civil action. We find that the lawyer transgressed permissible bounds and order that he be privately reprimanded.

II.
Attorney Q represented the plaintiff in action arising out of a September, 1984, automobile accident. Attorney Q's client was not the conventional personal injury plaintiff but rather was the owner of a building said to have been damaged when the defendant's vehicle left the road and struck it.
Attorney Q's first recorded act for his client appears to have been on October 17, 1984, when he notified Crawford and Company, claims adjusters, that he represented the owner of the damaged premises and asserted a claim on her behalf. It appears that Crawford and Company advised that it was acting for Dixie Insurance Company, the offending vehicle's liability carrier. On November 5, 1984, Attorney Q wrote to Dixie asserting the property damage claim. Hearing nothing, Attorney Q on November 27, 1984, wrote Crawford and Company advising that the "company should be put on notice."
In November of 1984, Attorney Q approached Robinson, the owner of the adverse vehicle, while she was at work. He explained that he represented the property damage plaintiff and asked some questions about the incident. Attorney Q specifically discussed with Robinson the liability insurance coverage she had with Dixie Insurance Company.
On December 30, 1984, Attorney Q approached Cassandra Thomas, a minor, the driver of the offending automobile. Thomas was not represented by counsel and had no one to assist her. Notwithstanding, Attorney Q took from Thomas a handwritten narrative statement of Thomas' version of what happened during the accident and Thomas' assessment of who was responsible *230 for the accident. Thomas said both Robinson and she were drunk at the time of the accident and that the accident was her fault. However, Thomas' statement also blames Robinson for the accident since it was Robinson's vehicle, and Robinson knew that Thomas was drunk when she asked her to drive.
On January 15, 1985, Attorney Q filed in the Circuit Court of Hinds County, Mississippi a complaint wherein, on behalf of his client, the owner of the damaged property, he sued Robinson and Thomas, charging the latter with negligence and the former with negligent entrustment. The complaint demanded some $8,870.00 in damages for the building. In any event, on the day he filed suit, Attorney Q went to Robinson's place of employment, at a time when both Robinson and Thomas were present, and asked the two of them to go to the Hinds County Courthouse in order that they may be served with summons. It appears that Attorney Q made full disclosure why he was taking Robinson and Thomas to the courthouse and that each consented thereto.
The Sheriff delivered the summons to Robinson and Thomas. What then happened is central to the case, and in assessing what happened it is important that we remember, in the words of the Complaint Tribunal, "Robinson is a person of limited education and general business experience, a welder by trade, and of virtually no knowledge regarding matters of legal import." Robinson's colloquy with Attorney Q follows:
Q ... . Is it possible, since you talked to Ms. Saunders [attorney hired by the liability insurance carrier] as you just stated and she went over some of the objections that she had, is it possible that her conversation with you emphasizing these different points, that now that you look back, it may be difficult to differentiate between maybe what Ms. Saunders said to you and some of the things that took place back then when you were involved in the treatment or that sort of thing?
A No. I don't think it does because I remember you coming and talking to me.
Q Sure.
A And I remember going down to the courthouse and you being there and we getting presented with the papers.
Q All right. What I was drawing your attention to was some of the statements that 
A Well, I asked you what I should do, should I contact the insurance company. You said, "No. Don't worry about it. Don't do anything."
Q Is that the actual recollection that you have at that time, or is that something that has been mentioned by Ms. Saunders or somebody?
A No. I remember you definitely saying that.
Q Okay.
A Not to do anything. So I didn't, and then I'm presented with the case.
Q In other words, did you think that I was your lawyer? Was that your impression? No.
A No.
Q Is it your statement under oath, now, that you did not contact your insurance company because the lawyer for Ms. Summers told you not to do that?
A Rephrase that again?
Q Is it your statement  now, think what you're saying, now; and if you have a blank or you don't recollect it, don't make it as a positive statement unless you actually remember it as the truth. Are you stating that you did not contact your insurance company because the lawyer for Ms. Summers, who is on the other side, told you not to contact your own insurance company?
A You said not to.
Q That's your statement.
A You said not to do anything, not to worry about it. That's exactly what you said.
On January 18, 1985, Attorney Q addressed another letter to Crawford and Company advising that suit had been filed against Robinson and Thomas. Twelve days later  January 30, 1985  Crawford and Company addressed a letter to Attorney *231 Q discussing the case, acknowledging receipt of Attorney Q's letter, and stating "I feel you will be hearing from Dixie Insurance Company or its representative in the near future."
For whatever reason, nothing happened for several weeks. On February 25, 1985, Attorney Q filed in the Circuit Court an application for entry of default with supporting affidavit. See Rule 55(a), Miss. R.Civ.P. The application contains no certificate of service upon Robinson, nor is there any other indication a copy was furnished to Robinson or to her insurance company. The application recited that more than thirty days had elapsed since service of summons and that no answer had been filed. On the same day, the Clerk noted "defendant's default." Immediately thereafter, Attorney Q procured a default judgment. Rule 55(b), Miss.R.Civ.P. Two days later, Attorney Q, again proceeding ex parte, appeared before the Circuit Court and obtained final judgment on writ of inquiry that his client have and recover from Robinson a final judgment in the sum of $8,874.00.
On March 19, 1985, Dixie Insurance Company finally retained counsel to defend Robinson. Further proceedings resulted in an order setting aside the default judgment. The suit was eventually tried before a jury on the issue of damages only, at the conclusion of which plaintiff recovered a property damage judgment in the amount of $2,000.00.

III.

A.
On May 12, 1986, the Mississippi State Bar (MSB) filed a complaint alleging that Attorney Q had violated DR 7-104(A)(2), Code of Professional Responsibility (1983), by giving advice to Thomas while she was not represented by counsel and by taking a notarized statement from Thomas. The Committee on Complaints issued an informal admonition which Attorney Q rejected. On February 22, 1988, MSB filed the present complaint charging, inter alia that Attorney Q violated DR 7-104(A)(2) by advising Robinson, while she was not represented by counsel.
Arising out of the foregoing, a Complaint Tribunal has recommended that Attorney Q be privately reprimanded, this by Order entered May 15, 1989. Attorney Q has sought review in this Court where at least three familiar principles obtain.
For one thing, this Court by law is the finder of fact in matters such as this. Our great respect and appreciation for the work of those who serve on the complaint tribunals may not, as a matter of law, translate into any duty of deference to findings or decisions there made. In practical effect, we proceed ab initio. See Mississippi State Bar v. Odom, 566 So.2d 712, 714 (Miss. 1990); Mississippi State Bar v. Nichols, 562 So.2d 1285, 1287 (Miss. 1990); Mississippi State Bar v. Varnado, 557 So.2d 558, 559 (Miss. 1990); Levi v. Mississippi State Bar, 436 So.2d 781, 783 (Miss. 1983).
Bar disciplinary proceedings are quasi-criminal in nature. Mississippi State Bar v. Nichols, 562 So.2d at 1292; Mississippi State Bar v. Attorney L, 511 So.2d 119, 121-22 (Miss. 1987); Attorney K v. Mississippi State Bar Association, 491 So.2d 220, 222 (Miss. 1986); Levi v. Mississippi State Bar, 436 So.2d at 783. The analogy is not complete. For one thing, the law does not require that we find intent as in criminal cases; rather, the Rules of Discipline import objective standards, and we may impose sanctions upon findings of incompetence, neglect or other violations short of deliberate or intentional misconduct. See Fougerousse v. Mississippi State Bar Association, 563 So.2d 1363 (Miss. 1990); Steighner v. Mississippi State Bar, 548 So.2d 1294 (Miss. 1989); Vining v. Mississippi State Bar Association, 508 So.2d 1047 (Miss. 1987). A corollary principle is that we interpret the rules from the perspective of the reasonable client or, in this instance, the reasonable layperson with whom the lawyer is charged with misdealing. Cf. American Law Institute Restatement of the Law: The Law Governing Lawyers, § 29A(2) (Prelim. Draft No. 6, July 25, 1990).
*232 The beyond-a-reasonable-doubt standard does not apply; rather, we require an intermediate level of certainty regarding the facts at issue, to-wit: a clear and convincing evidence standard. Mississippi State Bar v. Odom, 566 So.2d at 714; Mississippi State Bar v. Nichols, 562 So.2d at 1287; Levi v. Mississippi State Bar, 436 So.2d at 783; Netterville v. Mississippi State Bar, 397 So.2d 878, 884 (Miss. 1981).
We handle the privilege against self-incrimination somewhat differently when compared with the strictures attendant upon a criminal prosecution. Mississippi State Bar v. Attorney L, 511 So.2d at 122-126.

B.
By formal complaint, the bar has charged Attorney Q with a violation of former DR 7-104(A)(2), which at the time in question provided:
During the course of his representation of a client a lawyer shall not:
(2) Give advice to a person who is not represented by a lawyer other than advice to secure counsel, if the interests of such person are or have reasonable possibility of being in conflict with the interests of his client.
Attorney Q first argues that we should not enforce this rule against him for the reason that it has been supplemented and amended by the Mississippi Rules of Professional Conduct (MRPC), effective July 1, 1987. Although DR 7-104(A)(2) was in full force and effect at the time of the actions with which he is charged, Attorney Q says he should get the benefit of what he perceives to be the more liberal provisions of the current rule. The problem with the argument is that we perceive no change of substance in the current rules.
The restriction on a lawyer's ex parte communication with an unrepresented party opponent has a long history. While prohibiting communications with opposing parties in general, Canon 9 of the old American Bar Association's Canons of Professional Ethics placed special emphasis on contacting unrepresented opposing parties. Canon 9 provided "... It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."
Canon 9 was succeeded by DR 7-104 of the Code of Professional Conduct and Ethical Consideration 7-18. DR 7-104's prohibitory language expresses essentially the same mandate as did Canon 9, but there are noticeable differences. The language in DR 7-104(A)(2) speaks in terms of an unrepresented "person" rather than Canon 9's "party," omits the proscription against "misleading" such a person and, while Canon 9 proscribed giving an unrepresented person "advice" as to the "law," DR 7-104(A)(2) speaks merely of "advice" without the qualifying language. Nevertheless, ABA Informal Opinion No. 1140 (adopted January 20, 1970) declares that the effect of former Canon 9 and DR 7-104(A)(2) "appears to be substantially the same," and DR 7-104(A)(2) therefore simply carries forward the meaning and intent of Canon 9. See ABA Informal Opinion No. 1140.
On July 1, 1987, this Court adopted the Mississippi Rules of Professional Conduct (the "Rules") which includes Rule 4.3, the Rules' counterpart of the Code's DR 7-104(A)(2).
Rule 4.3 of MRPC provides:
In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.
Further, the Comment provides:
An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. During the course of a lawyer's representation of a *233 client, the lawyer should not give advice to an unrepresented person other than the advice to obtain counsel. [Emphasis supplied]
Attorney Q challenges the Comment's effect. The official preamble to the new Rules, entitled the "Scope," notes that:
The Rules of Professional Conduct are rules of reason... . Comments do not add obligations to the Rules but provide guidance for practicing in compliance with the Rules.
.....
Moreover, the Rules presuppose that whether or not discipline should be imposed ... depend on all circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations.
.....
The Comments are intended as guides to interpretation, but the text of each Rule is authoritative.
As we read the new Rules, the only change is one of form: that a lawyer shall not give advice other than advice to secure counsel is no longer explicit in the Rule itself but has been relegated to the Comment where, of course, it stands as an interpretation of the Rule. Accepting the facts as related above, we may only find that Attorney Q has offended the Rule whether it be in the form of former DR 7-104(A)(2) or the present Rule 4.3.

C.
Attorney Q seeks escape from the Rule by arguing lack of bad or improper motive. He insists that all along, he was in touch with Robinson's liability insurance company, directly and through its claims adjuster, and that he never intended anything other than effecting a settlement within the insurance coverage. Moreover, Attorney Q argues that "don't worry about it" was not legal advice at all. He describes this as a "genial acclamation, such as `keep a stiff upper lip.'"
We have considered both of these arguments and reject each. It is important to realize that we interpret Attorney Q's statements from the perspective of a reasonably intelligent non-lawyer in Robinson's position. We are not so much concerned with what Attorney Q may have intended; rather, our focus is upon what Robinson may reasonably have heard and understood. So viewed, we think the only fair interpretation of what Attorney Q said to Robinson is that, once served with the summons, she did not need to worry about the matter and did not need to do anything about it. Attorney Q compounded his felony some forty days later when he had a default judgment entered against Robinson, although he has been formally charged with no disciplinary offense in this regard.

D.
In sum, we hold that on January 15, 1985, the Mississippi State Bar had in full force and effect a valid rule providing that, during the course of his representation of a client, a lawyer may not give advice to another who may be reasonably perceived to have conflicting interests where the other is not represented by counsel, other than advice to secure counsel. We find by clear and convincing evidence that Attorney Q committed the acts described in the Complaint and in Part II above and that these acts constitute a violation of the rule.

IV.
MSB asks that we address an additional issue. At the hearing before the complaint tribunal, MSB's complaints counsel called Attorney Q as an adverse witness. In response, Attorney Q asserted his "Fifth Amendment right to refused to be called as a witness, and claimed that right."
After hearing argument from counsel and considering Mississippi State Bar v. Attorney L, supra and Mississippi State Bar v. Attorney-Respondent, 367 So.2d 179 (Miss. 1979), the Tribunal ruled that:
While we (the Tribunal) could require the Respondent to respond to his calling to come to the stand as an adverse witness *234 and testify under oath, it would not be productive of things that would be particularly revealing as to the issues at hand and would just simply involve a repeated assertion as to every question when he got beyond the preface questions of education and background and identify, etc.
In response to the Tribunal's ruling, counsel for the Bar made a proffer of what the Bar intended to prove through Attorney Q's testimony.
The Bar urges that the Tribunal misinterpreted this Court's ruling in Attorney L v. Mississippi State Bar, and should have allowed the Bar to call and question Attorney Q as an adverse witness. This Court, in Attorney L, stated that the privilege against self-incrimination is not available to a respondent on a blanket basis. Attorney L, 511 So.2d at 123; see also Mississippi State Bar v. Attorney-Respondent, supra.
Without question, Attorney Q enjoyed no blanket basis privilege as would have been accorded him in a criminal prosecution. Attorney L articulated the standards and processes the Tribunal ought use in matters such as this. We affirm those rules today. On the other hand, the Tribunal enjoys a certain level of discretion in the handling of evidentiary matters such as this. Under the circumstances, we hold the Tribunal acted within its discretion in its handling of Attorney Q's Fifth Amendment claim.

V.
MSB argues further that the Tribunal's sanction of a private reprimand was improper. MSB urges at the very least that the Court should issue to Attorney Q a public reprimand.
This Court, over the years, struggled to find fairness and even-handedness in the issuance of sanctions in lawyer disciplinary matters. We have considered a number of factors in assessing the nature and extent of sanctions to be imposed. These factors include:
1. The nature of the misconduct involved;
2. The need to deter similar misconduct;
3. The preservation of the dignity and reputation of the profession;
4. The protection of the public; and
5. Sanctions imposed in similar cases.
Fougerousse v. Mississippi State Bar Association, 563 So.2d at 1366; Steighner v. Mississippi State Bar, 548 So.2d at 1297-98; Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987); Mississippi State Bar Association v. A Mississippi Attorney, 489 So.2d 1081, 1083 (Miss. 1986).
Considering these factors, we are of the opinion that the Complaint Tribunal was correct when it ordered that Attorney Q should be privately reprimanded. By reason of his aforesaid conduct and violation, we hereby order:
A. That Attorney Q shall be, and he hereby is, privately reprimanded;
B. That this reprimand shall be served upon Attorney Q by the Clerk's forwarding to him a copy of this Opinion by certified mail, return receipt requested, restricted delivery, addressee only;
C. That Attorney Q be, and he hereby is, taxed with all costs as provided by law; and
D. That this matter shall in all respects be treated as confidential within the scope and contemplation of the Rules of Discipline.
ORDER ENTERED THAT ATTORNEY Q BE PRIVATELY REPRIMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., PRATHER, SULLIVAN, PITTMAN, BANKS, JJ., concur.
McRAE, J., dissents with separate written opinion, joined by DAN M. LEE, P.J.
McRAE, Justice, dissenting:
Initially, it is important to consider that attorney disciplinary cases are quasi-criminal in nature. Mississippi State Bar v. Nichols, 562 So.2d 1285, 1287 (Miss. 1985). Further, it is undisputed that the charges in these cases must be proved by clear and convincing evidence. Mississippi State Bar v. Odom, 566 So.2d 712, 714 (Miss. *235 1990). The majority opinion admittedly includes these basic propositions, however, it apparently dismisses their import in this case.
The majority notes that the offending statement, "Don't worry about it," must be interpreted from the perspective of a similarly-situated, reasonably intelligent non-lawyer. In so doing, it succeeds only in being hoist with its own petard. Simply put, Robinson could not reasonably understand Attorney Q's statement as legal advice of any kind.
It is also important to remember that Robinson had a GED diploma and performed reasonably demanding work. She was not illiterate, even though the majority uses the description welder in the pejorative sense. It is clear from her testimony that she read the summons.
Q. Mrs. Robinson, do you recall who actually gave you those papers that I have just presented to you?
A. No, I really don't.
Q. Was it [Attorney Q]?
A. I really don't remember. I know that we got them and then we left.
Q. O.K. Well, after you were presented with those papers, you said that you left. Was there any further discussion?
A. Well, I asked what  I looked over them, and I asked what I should do, and he said not to worry about them, you know, and I didn't.
Q. Who did you ask what to do?
A. [Attorney Q].
Q. What was his response again?
A. He said not to worry about, and I didn't.
Q. Was there any other discussion between you and [Attorney Q] prior to you parting company that day?
A. No. I don't believe so.
Q. What did you do after you were served with those papers and you left?
A. I believe I went back to work shortly after that.
Q. Did you contact an attorney?
A. No.
Q. Why not?
A. He said not to worry about, and I didn't.
Q. Did you contact your insurance company?
A. No, I did not.
Certainly after reading the summons, which clearly explains what to do and the consequences of failure to comply, it is evident that Robinson has only herself to blame for failing to forward it to her insurance company.
Moreover, it would not even have been in Attorney Q's interest to persuade Robinson not to contact her insurance company. It is well known that such conduct most probably would lead the insurance company to refuse coverage. In that event, Attorney Q's client would have a worthless judgment. In this case several interpretations could be taken as to what the attorney had stated. The attorney had been in contact with the insurance company on November 27, 1984, and attempted to settle this case. Negotiations for settlement continued and several meetings were held with the adjuster through the months of November and December and after the summons were served. A chronology of pertinent events follows:
October 17, 1984 [Attorney Q] called Roy Moore, Crawford & Company, local Adjuster for Stonewall Insurance Company.
Sometime in November, 1984 Robinson visited by [Attorney Q] to ask questions in interest of Maxine Summers.
November 5, 1984 Letter from Stonewall to Robinson requesting she get in touch with insurance company.
November 27, 1984 Letter from [Attorney Q] to Moore stating he represented Maxine Summers and submitting bills of $8,874.00.
December 11, 1984 [Attorney Q] called Stonewall  memo in Stonewall file.
December 30, 1984 Date of Cassandra Thomas statement re: accident (received by [Attorney Q]).
January 15, 1985 (1) [Attorney Q] filed complaint.
(2) [Attorney Q] met Thomas & Robinson at the Hinds County Courthouse where *236 they were served with summons and complaint.
(3) [Attorney Q] told Robinson "Don't worry about it" when asked what she should do about the summons.
January 18, 1985 Letter from [Attorney Q] to Moore stating suit had been filed in Hinds County Circuit Court.
January 21, 1985 [Attorney Q] letter mailed to Stonewall by Moore.
January 30, 1985 Memo to [Attorney Q] from Moore stating letter from [Attorney Q] was mailed to Stonewall.
February 25, 1985 [Attorney Q] filed Application for Default Judgment. Entered same day against Robinson.
February 27, 1985 Final judgment upon Writ of Inquiry granted for $8,874.00. NOTE: Neither Stonewall Ins. Co. (carrier) or Robinson received notice.
March 1, 1985 Robinson contacted by Supervisor of Automobile Property Damage Claims Dept. of Stonewall Ins. Co. Robinson advised supervisor she had been served with complaint but [Attorney Q] told her to take no action.
March 4, 1985 Statement by Malisa Robinson.
March 5, 1985 Suzanne Saunders involved with case by Stonewall.
March 8, 1985 [Attorney Q] letter discussing settlement with carrier.
March 19, 1985 File mailed to Saunders by Stonewall.
March 21, 1985 Motion to Set Aside Default Judgment filed by Saunders (Robinson noticed).
March 28, 1985 Hearing on Motion to Set Aside.
April 26, 1985 Order setting aside Default Judgment.
Sometime after July, 1985 Jury trial on damages  returned verdict of $2,000 for Maxine Summers.
Under our rules, this Court has not allowed direct action against an insurance company involving a third-party claim, even though Miss.R.Civ.P. 18 allows such. Failing to resolve a matter with the insurance company, the attorney is left with no other recourse except to file suit against the insured. This was done and she was served. All companies instruct their insureds that whenever they are sued, to bring the summons to the company and cooperate with it and, if they choose not to follow these instructions, coverage will be denied.
Shortly after issuance of the summons and the incident at the courthouse in question, Attorney Q again contacted the insurance company's agents, but they still did not seek to defend the suit. Default judgment was taken and, on a writ of inquiry, a final judgment was entered. Finally the insurance company retained counsel and successfully set aside the judgment. A jury trial followed and Attorney Q's client recovered $2,000 from the insurance company.
Oftentimes, opposing counsel will say to the other party, "Don't be nervous, don't worry. We are going to only ask a few questions." Are they to be punished?
The statement was not meant as legal advice and could not reasonably have been understood as legal advice. Therefore, we should not use that statement as a basis for reprimanding the attorney. For these reasons I dissent from the majority opinion.
DAN M. LEE, P.J., joins this dissent.