508 So.2d 1120 (1987)
An Attorney (John C. HOFFMAN)
v.
MS STATE BAR ASSOCIATION.
CM No. 184.
Supreme Court of Mississippi.
June 3, 1987.
Jerry O. Terry, Greaves, Terry & Sheely, Gulfport, for appellant.
Michael B. Martz, Jackson, for appellee.
*1121 Before En Banc.
ANDERSON, Justice, for the Court:
This appeal proceeds from the disbarment of John C. Hoffman by the MS State Bar Association. This action comes as the result of appellant's involvement or participation with employees of Aetna Finance Company to defraud that company of money where appellant was serving as counsel.
The complaint tribunal adjudged appellant guilty of misconduct in violation of certain disciplinary rules of the Code of Professional Conduct of the MS State Bar.
After a painstakingly thorough examination of the facts and the applicable law in this case, we likewise find that appellant was guilty of unprofessional conduct. However, for reasons explained herein, we reverse the judgment of disbarment by the Complaint Tribunal and order that appellant be suspended from the practice of law for a period of one year.

FACTS
Appellant was appointed Long Beach City Prosecutor in 1977 and served as city attorney from 1981 through 1984, when he took a leave of absence.
He began work for Aetna Finance Company, a subsidiary of IT & T in Gulfport in 1978. His primary duty was to handle real estate matters, but he agreed to handle collections as well. For these services he was to be paid on a schedule. Appellant was also an agent for U.S. Life Title Insurance Company.
Bill Rivenbark was branch manager of the Aetna Gulfport office from 1976 through 1982 and Travis Lott was regional manager until 1983 with his office located in the Gulfport office.
These two persons, along with others, participated in schemes wherein Aetna was defrauded of more than $500,000, mainly through improper loans to themselves, their families and friends. It is with Lott and Rivenbark that the appellant worked and is accused of having participated in various fraudulent schemes. Charges were brought against appellant stemming from his involvement in the two transactions described below:
A. On October 2, 1979, Oscar Joseph Nile executed a deed of trust to Aetna secured by certain real property (two lots) in Hancock County. He subsequently defaulted and the appellant completed foreclosure on the property on behalf of Aetna in January 1981. Lott and/or Rivenbark offered to sell the property to appellant for $2,500. The sale was approved by the home office and appellant purchased the property in March 1981.
It is first alleged that the appellant, Rivenbark and Lott had agreed that appellant would be reimbursed the purchase price of the property from Aetna funds by submitting bills for services not rendered and charging double his fees for services rendered. The three would then split the proceeds of the resale of the property.
Appellant admits purchasing the property but contends the double payments were reimbursements for past services rendered to Aetna. Appellant testified that in the past he received no payment for claims and deliveries, replevins and for transactions where the company recovered no money. In 1980 or 1981, Lott supposedly approached him and informed him that in the future he would be paid $50 for those services. Lott told him that all of the other attorneys in this district had been paid and it was not fair that he had not been paid for his services. Lott then orally promised that he would receive double payments for these services for the next four or five months to make up for unpaid arrearage. This was not authorized by the company.
George Payne, assistant chief of police in Gulfport, and Ken Pell, chief of police in Long Beach and a personal friend of appellant's, interviewed the appellant during the Aetna investigation. Both testified that Appellant admitted that Lott and Rivenbark had agreed to repay the purchase price of the property to him by means of the fraudulent billing and that he received said payments. District Attorney Cono Carrana testified appellant also made such admission to him. Robert Barrett, a member *1122 of the grand jury testified that appellant made such admission in that hearing.
Appellant listed the property for sale, but received no offers. Sometime later Lott and/or Rivenbark informed appellant they had a buyer. Appellant prepared the deed and the buyer, Linda Allen, a/k/a Linda Joyner (hereinafter Allen) purchased the property for $3,600 in January 1982. Allen was Rivenbark's sister. Appellant contends he did not know of the relationship at the time.
On the day of the sale, appellant admits paying a cash "finder's fee" to Lott and/or Rivenbark in the amount of $500 to $800. Records show that appellant paid taxes on the full sale amount without deducting the finder's fee.
Barrett testified that the appellant admitted before the grand jury that he paid $800 each to Lott and Rivenbark as their share of the land transaction. D.A. Carrana also testified to such admission (using Barrett's notes taken during the grand jury hearing to refresh his memory). Officer Payne testified that appellant admitted paying $800 during the interview.
Despite company rules prohibiting loans to family members, Allen received a $15,000 loan from Aetna, arranged by Rivenbark, on the property purchased from appellant.
Secondly, it is alleged that appellant prepared and signed a title policy of insurance on the property knowing the deed of trust had not been recorded as indicated in the document.
The main Aetna office requested the paper work and insurance on the Allen property (in a random selection) and a title policy was prepared. The policy bore appellant's signature on the cover sheet and falsely represented that a deed of trust had been filed. It is noted that the appellant was under no duty to file the deed of trust, the allegation is that he submitted papers knowing the deed of trust had not been filed at all.
Appellant contends he was asked to do a title binder on the property. He did the binder but was not requested and does not remember issuing the policy. Appellant further asserted that there were several errors on the interior of the policy that were not typical of work coming from his office. He stated that since the cover sheet contained no name or policy identification, that sheet could have been taken from one of a number of other policies in his office. Appellant also surmised that the policy might have left his office accidentally; via Sherry Lott, wife of Travis Lott who was employed by appellant as an abstracter in his office from 1979 until 1984; or that Lott himself could have used Sherry's keys to gain access to the office and take the cover sheet.
DA Carrana obtained a copy of the title policy from Bill Rivenbark. Carrana, Pell and Payne all testified that Caranna showed appellant a copy of the title policy during the earlier interview and interrogation and that appellant admitted having prepared the policy.
Caranna also testified that appellant recanted somewhat saying that he did not see how the policy, with the errors contained could have gotten out of his office in that shape. Barrett also testified that appellant made this statement before the grand jury.
B. In 1981 Rivenbark approached Wesley Watts, his neighbor, and persuaded him to obtain a loan from Aetna in the amount of $33,000. Watts owned his home jointly with his wife, who apparently would not agree to mortgage the home, since they had not requested such loan. Rivenbark supposedly gave Watts a quit claim deed to Rivenbark's home to use as collateral.
At the closing of this loan, Watts went to Rivenbark's Aetna office to sign the papers. Watts stated the appellant and Lott were already present in the office. They were on the other side of the room away from the desk where Watts and Rivenbark conducted business. Watts said he believed he was told at that time that appellant had prepared the deed. He stated the appellant did not participate in the transaction and was engaged in conversation with Lott and unattentive to them.
Appellant testified that he had checked the title on Watts' property and informed *1123 Lott and Rivenbark that the property was jointly owned, therefore Watts did not qualify for a loan. The appellant denied having prepared the deed and stated he was at the office during the transaction purely by chance. He and Lott were discussing redfishing and he did not hear anything that was said between Watts and Rivenbark, nor did he know what kind of loan was being made. There was testimony that the size of Rivenbark's office was 12' X 12'. Watts also demonstrated the tone of voice used for the tribunal.
From the proceeds of this loan Watts gave Rivenbark $10,000 cash and deposited the balance in Watts' checking account, disbursing the remainder at Rivenbark's direction. Watts received about $900 of this amount for his personal use.
On August 25, 1981, Watts wrote a check in the amount of $2,000 payable to appellant as directed by Rivenbark. Appellant had performed no services for Watts and Watts did not know the purpose of the payment.
Appellant stated he believed the money to be a loan from Watts to Rivenbark used to purchase a one-half interest in property from appellant.
The appellant in 1978 purchased foreclosed property from Aetna for $4,000. This property was described by appellant as more or less an undesirable piece of property. Nevertheless, in August 1981, he sold Rivenbark a one-half interest in the property for $2,000. This transfer was duly recorded in September 1981. Two years later, Rivenbark, in need of attorney's fees, sold this interest back to appellant for $2,000. Appellant gave Rivenbark a check in this amount written on his trust account. This transfer was recorded in June 1983.
The tribunal held that even if the sale was legitimate appellant nevertheless accepted $2,000 from Watts knowing that such proceeds were fraudulently procured. Appellant has denied any such knowledge.
This suit was prompted after a February 1983 routine annual audit of Aetna/Gulfport which disclosed grave irregularities in more than twenty of the real estate transactions.
During the initial investigation by IT & T investigators, appellant was not a suspect in any wrongdoing. In an interview with these persons (Kinchen and Appelman) appellant informed them of the improper operation of the office, questionable loans being made, the frequent presence of disreputable or undesirable persons in the office and rumors of loans made for the purpose of gambling.
What records had existed in the Aetna office had been stolen or destroyed, presumably by those engaged in the improper activities.
On April 6, 1984, during a criminal investigation of the matter, appellant was interrogated by several law enforcement officers. Officers Payne and Pell testified that when told he had been implicated in the fraudulent deals, appellant was extremely remorseful, emotional, and apologetic.
Appellant was taken that same day at his request to the district attorney's office where again it is alleged that he confessed wrongdoing and was very contrite. He was concerned about being indicted and offered to cooperate. Neither of the officers took a signed statement from the appellant and as a result there is little documentary evidence in this case.
Appellant waived indictment and entered into an agreement with the district attorney whereby the DA would turn the matter over to the State Bar Committee on complaints and in the event there was a public reprimand, the matter would be at an end; however, in the event of a more serious resolution of the matter by the bar, then the DA would pursue charges of false pretense against the appellant. The district attorney noted that the appellant's cooperative spirit began to wane during the grand jury hearing.
At trial, Travis Lott invoked the Fifth Amendment and refused to answer any questions. Subpoenas for Rivenbark were returned marked "not found." Appellant testified on his own behalf denying any involvement in any wrongdoing.
*1124 By stipulation, testimony was permitted by Scott Jordan of Ticor Title Insurance Company, to the effect that the appellant presently represents them and is trusted with millions of dollars.
Barbara Hoffman, appellant's wife testified that they experienced no financial problems within the last five years.
Stipulated testimony of John S. Morris, Senior Chancellor of that district, was that the appellant had a good reputation for honesty and integrity.
At the conclusion of the hearing, the complaint tribunal found the appellant guilty of misconduct in violation of the following rules and recommended disbarment:
DR1-102(A)(1, 3, 4, 5 & 6) which provides that a lawyer shall not violate a Disciplinary Rule; engage in illegal conduct involving moral turpitude; engage in conduct involving dishonesty, fraud, deceit or misrepresentation; engage in conduct that is prejudicial to the administration of justice; or engage in any other conduct that adversely reflect on the attorney's fitness to practice law.
DR2-106(A) which provides that a lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee.
DR7-101(A)(3) which provides that a lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship.
DR7-102(A)(3, 4, 5, 6, 7, & 8) which provides that a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal; knowingly use perjured testimony or false evidence; knowingly make a false statement of law or fact; participate in the creation or preservation of evidence when he knows that it is obvious that the evidence is false; counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent; or knowingly engage in any other illegal conduct or conduct contrary to a Disciplinary Rule
DR7-102(B)(1) which provides that when a lawyer who received information clearly establishing that his client has, in the course of the representation, perpetrated a fraud upon a person or Tribunal shall promptly call upon his client to rectify the same and if the client refuses or is unable to do so, he shall reveal the fraud to the effected person or Tribunal.

LAW
The only issue that we concern ourselves with is sufficiency of the evidence. In cases of this nature, this Court reviews the evidence de novo, sitting as triers of fact. Levi v. MS State Bar, 436 So.2d 781 (Miss. 1983). See also Rule 9.4, Rules of Discipline, MS State Bar.
It is of some concern to us that the bulk of the evidence consists chiefly of oral inculpatory statements or confessions allegedly made by Hoffman to law enforcement officers and members of the grand jury. This, coupled with his denial of the allegations and statements weakens the Bar's case to some degree. For that reason only, we hesitate to affirm the order of disbarment.
However, appellant is by no means absolved of obvious wrongdoing because the evidence is oral. As triers of fact, the weight and credibility afforded the witnesses as well as the resolution of conflicts in the testimony is in the province of this Court. Groseclose v. State, 440 So.2d 297 (Miss. 1983); Jackson v. Griffin, 390 So.2d 287 (Miss. 1980).
There is more than sufficient evidence to support a conclusion that Hoffman was fully cognizant of the schemes and activities of Rivenbark, Lott and others which were adverse to the interests of Aetna. Moreover, there is evidence that he participated with such persons to the detriment of Aetna.
First, appellant conspired with Lott and Rivenbark to bill Aetna for services not rendered. Like the Complaint Tribunal, we reject appellant's feeble explanation of his involvement in the various plots and schemes.
The record supports a finding that the appellant knowingly participated in the double-billing and subsequent fraudulent title-policy *1125 execution in violation of DRI-102(A)(4) and DR2-106(A) forbidding a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation or to collect an illegal fee.
Secondly, appellant knew of Rivenbark's scheme to extract funds from Aetna via his neighbor, Wesley Watts. The appellant admittedly knew, through his own research, that Watts was ineligible for a home loan. Yet, he was present in Rivenbark's 12' X 12' office when a home loan was indeed made to Watts. In fact appellant thereafter accepted proceeds from this transaction.
While appellant denies any knowledge of the transaction, we find it most difficult to believe that a person of such intelligence could stand in the midst of such chicanery and be totally oblivious to the activities around him.
Our view that appellant had knowledge of the unethical and illegal activities transpiring is supported by testimony of the appellant and by others as well. When confronted, appellant informed Aetna investigators of the known improper and questionable practices in the local office.
Appellant has certainly breached his ethical responsibilities, the most obvious of which being DR7-101(A)(3), forbidding an attorney to prejudice or damage his client during the course of the professional relationship. He was also under a duty to disclose the illegal conduct of which he had knowledge. DR 7-102(A)(3, 4, 5, 6, 7 and 8).
This Court has continually condemned fraudulent and deceitful practices by members of the Bar. See, Brumfield v. MS State Bar Asso., 497 So.2d 800 (Miss. 1986); MS State Bar Assoc. v. Strickland, 492 So.2d 567 (Miss. 1986); Clark v. MS State Bar, 471 So.2d 352 (Miss. 1985).
We find in this case that the appellant's conduct was reprehensible. The accusations made undoubtedly constitute disbarrible offenses. Had there been more in the way of direct or documentary evidence, this Court would not hesitate to support the judgment of the Tribunal. However, in the absence of stronger evidence, we find that appellant's conduct warrants no less than the penalty here pronounced. It is ordered that appellant be suspended from the practice of law for a period of one year. The complaint tribunal's finding for disciplinary action is affirmed, the disbarment reversed and appellant suspended for a period of one year.
AFFIRMED IN PART AND REVERSED IN PART AND APPELLANT SUSPENDED FOR ONE YEAR.
WALKER, C.J., HAWKINS, P.J., and DAN M. LEE and ROBERTSON, JJ., concur.
ROY NOBLE LEE, P.J., and PRATHER and SULLIVAN, JJ., dissent.
GRIFFIN, J., not participating.
SULLIVAN, Justice, dissenting:
With great respect I dissent from the judgment reached by the majority in this case. It is my opinion that the Court confused the nature of the evidence in this bar proceeding with the nature of the evidence in a criminal case styled State of Mississippi v. Hoffman, 508 So.2d 669 (Miss. 1987). I agree that the evidence was insufficient to convict Hoffman of any crime but I am thoroughly convinced that the evidence was sufficient to find Hoffman guilty of unprofessional conduct of such a nature that warrants his disbarment.
I take as my text for this conclusion the majority opinion commencing with the second paragraph on page 9 and concluding with the second sentence of the last paragraph of that opinion.
In my view the evidence is sufficient and I would therefore affirm the judgment of the tribunal and order that John C. Hoffman be disbarred and his name stricken from the rolls of the Mississippi State Bar Association.
ROY NOBLE LEE, P.J., and PRATHER, J., join in this dissent.