600 So.2d 166 (1992)
MISSISSIPPI STATE BAR
v.
Edward BLACKMON, Jr.
No. 89-BA-1161.
Supreme Court of Mississippi,
April 15, 1992.
Dissenting Opinion May 13, 1992.
*167 Michael B. Martz, Mississippi State Bar, Jackson, for appellant.
John L. Walker, Tomie T. Green, Walker & Walker, Jackson, for appellee.
En Banc.
Dissenting Opinion of Justice Banks May 13, 1992.
ROY NOBLE LEE, Chief Justice, for the court:
Following an informal complaint and the initial investigation, the Committee on Complaints directed that a formal complaint be filed against Mr. Edward Blackmon, Jr., and the State Bar subsequently filed a Formal Complaint against him on November 5, 1986. The formal complaint alleged that Mr. Blackmon had violated certain disciplinary rules of the Code of Professional Responsibility, specifically DR1-102(A)(5, 6), DR2-106(A, B), DR7-102(A)(3, 4, 5, 6, 7), and Miss. Code Ann. § 73-3-35 (1972) (as amended).
After this Court designated a Complaint Tribunal to conduct a hearing on the formal complaint, Mr. Blackmon filed an answer. He also moved that the proceedings be bifurcated so that the initial proceeding would decide solely the question of whether he had violated any disciplinary rules and a separate proceeding would determine the discipline to be imposed, should any violations be found. The Tribunal granted Mr. Blackmon's motion.
In summary, the Complaint Tribunal concluded that Mr. Blackmon had engaged in conduct prejudicial to the administration of justice; had knowingly failed to disclose that which he was required by law to reveal; had knowingly used false evidence or a false statement of facts; and had violated his oath as an attorney. There was no finding or inference by the Tribunal that Blackmon's failure to ascertain his clients bona fide residence was motivated by any malicious, willful, deceitful or fraudulent intent. The Tribunal further found Mr. Blackmon had not participated in the creation or preservation of false evidence, nor had he counseled or assisted his client in conduct known to be illegal or fraudulent, nor had he charged or collected an illegal or clearly excessive fee, nor had he engaged in any other conduct adversely affecting his fitness to practice law.
The parties agreed, however, to waive the holding of any further evidentiary hearings and further agreed to the submission of legal memoranda based upon the evidence already introduced with regard to the issue of discipline. Each party submitted memoranda and after considering the violations, the Complaint Tribunal entered an Opinion and Judgment on September 14, 1989, imposing a public reprimand on Mr. Blackmon for his professional misconduct.
The Bar filed an appeal. Mr. Blackmon filed his reservation of right to file a motion to dismiss appeal and notice of cross appeal, and submitted to the Court his willingness to accept the Opinion and Judgment of the Complaint Tribunal, as well as the punishment imposed, in order to bring to a conclusion the proceedings which had been pending against him by the Mississippi State Bar since April 23, 1986.

ISSUES ON APPEAL (as stated by Appellant)
I. Did the Complaint Tribunal err by finding that the Appellee, Edward Blackmon, Jr. had not charged and collected an excessive and unreasonable attorney's fee in violation of DR2-106(A and B) of the Code of Professional Responsibility in his representation of Johnny Earl Brown, a minor?
II. Did the Complaint Tribunal err when it did not impose discipline more severe than a public reprimand on the Appellee for his violations of the Code of Professional Responsibility?

*168 ISSUES ON CROSS-APPEAL (as stated by Appellee)
A. Whether the appeal of the Tribunal's ruling by the Mississippi State Bar in order to enhance appellee's punishment violates plaintiff's Fifth and Fourteenth Amendment rights under the United States and State of Mississippi Constitutions?
B. Whether the Mississippi State Bar's refusal to recommend punishment to the Tribunal, estops the Mississippi State Bar from contesting on appeal the Tribunal's punishment and/or whether the Mississippi State Bar waived its right to appeal to enhance punishment?
C. Whether the Tribunal's opinion and judgment that appellee's conduct violated Rules of Discipline were arbitrary and capricious, unsupported by clear and convincing evidence and manifestly wrong?
D. Whether the Tribunal's imposition of a public reprimand as discipline upon appellee was arbitrary and capricious, excessive and manifestly wrong?
E. Whether the Tribunal's ruling concerning pre-trial discovery and evidentiary matters denied Mr. Blackmon's due process of law and fundamental fairness rights guaranteed under the United States and Mississippi Constitutions and the Mississippi Rules of Civil Procedure?
F. Whether the prosecution of Edward Blackmon through a disciplinary system which systematically excludes Black attorneys from the disciplinary process, except as respondents, violates Edward Blackmon's due process, equal protection and fundamental fairness rights guaranteed under the United States and the State of Mississippi Constitutions?

STATEMENT OF THE FACTS
Johnny Earl Brown, the sixteen year old son of Christine Williams and Naron Bouldlin, was struck by a truck hauling a trailer loaded with cotton and driven by Robert Riddell in Canton, Mississippi on October 13, 1984. As a result, Johnny Earl suffered severe injuries to his head and the left side of the body. He was confined to the University of Mississippi Medical Center from approximately October 13, 1984, until January 4, 1985, and again from March 12, 1985, until April 19, 1985.
Originally, Mrs. Williams retained George Nichols, an attorney from Canton, Mississippi, to represent her and her minor son, Johnny Earl Brown a/k/a Johnny Earl Pate. Thereafter, Mr. Nichols associated Mr. Blackmon as lead counsel along with his partner, Ferr Smith, of the firm Blackmon and Smith, also of Canton, Mississippi.
Mrs. Williams entered into a retainer/contingency fee contract with Blackmon and Smith. Under the contract, Mrs. Williams would compensate Blackmon and Smith at the rate of forty percent (40%) "of all monies received" by Mrs. Williams on behalf of Johnny Earl. According to Mr. Blackmon, the contract was based on his assessment that a suit would have to be filed because Attorney Nichols had been unsuccessful in any settlement negotiations. At the time Mrs. Williams entered into the contract with Mr. Blackmon and Mr. Smith, she and Johnny Earl were both residents of Madison County, Mississippi, living in a home in which Mrs. Williams had lived her entire life.
On behalf of Johnny Earl, by and through his mother, Mrs. Williams, Mr. Blackmon filed a complaint in the Circuit Court of Madison County, Mississippi, against Robert Riddle and Charles Riddle who were doing business as Paragon Gin Company. Mr. Blackmon conducted some investigation prior to filing the complaint, but, for the most part Mr. Blackmon and Mr. Smith maintained their customary procedure whereby Smith would communicate directly with the client and conduct investigations, and Mr. Blackmon would handle the litigation and any settlement negotiations.
Mrs. Williams testified that Mr. Smith and Mr. Blackmon asked her to move Johnny Earl to Jackson or to Hinds County, Mississippi, in order to protect the integrity of their case. There is evidence that on more than one occasion Mr. Smith discussed such a move with Mrs. Williams; however, Mrs. Williams testified that she told him and Mr. Blackmon that she could *169 not afford to move. Neither Mrs. Williams nor Johnny Earl ever moved to Jackson or to Hinds County nor do either have relatives who live in Jackson or Hinds County.
The parties settled the case prior to the scheduled date of trial in a structured settlement. Consistent with his usual practice, defense counsel prepared the documents necessary to consummate the settlement, including a petition to appoint a guardian, a decree authorizing a guardianship, a petition for authority to settle a doubtful claim and an order authorizing settlement. Before these documents could be drafted, defense counsel needed certain information about Mrs. Williams and her son and requested that Mr. Blackmon and Mr. Smith provide this information. The information included an address for Johnny Earl and Mrs. Williams so that the guardianship would be filed in the appropriate county. In preparing the documents, defense counsel left certain information incomplete such as the amount of attorney's fees that were being requested to be awarded to Johnny Earl and the amount of the outstanding hospital and medical bills and what was actually going to be paid to compromise and pay these bills.
Defense counsel testified that he originally prepared the documents for the Chancery Court of Madison County, Mississippi, but redrafted the documents after he received information from Mr. Smith that Johnny Earl and Mrs. Williams were residents of Hinds County, Mississippi. Consequently, the guardianship was filed in the First Judicial District of Hinds County rather than in Madison County. Defense counsel then delivered the documents to Mr. Blackmon's office.
The address which Mr. Smith provided to defense counsel was initially given to Blackmon and Smith's secretary, Sandra McElroy. Mrs. McElroy testified that Mrs. Williams handed her a piece of paper or card with the address on it and said that the address was an address for her son regarding the case. According to Mrs. McElroy's testimony, at no time did Mrs. Williams indicate that the alleged address was both for Mrs. Williams and Johnny Earl. Nevertheless, she did indicate that Mrs. Williams said the address was for her son regarding the case. The address was allegedly in the vicinity of Jackson State University and was delivered to the office while Mr. Blackmon and Mr. Smith were at lunch. Mrs. McElroy testified that she gave the address to Mr. Smith, who subsequently showed the address to Mr. Blackmon. Neither Mr. Blackmon nor Mr. Smith could ever find the paper with the address thereafter. Mr. Smith could only recall that the address was in the vicinity of Jackson State University.
Mrs. Williams denied ever telling Mr. Smith or Mr. Blackmon that she lived in Hinds County and further denied that she ever gave Mrs. McElroy a piece of paper with an address for her son in Hinds County. Mrs. Williams readily admits that Mr. Blackmon never asked her to lie to the Hinds County Chancellor Joe Moss nor did he ask her to misrepresent her and Johnny Earl's residency as being in Hinds County rather than in Madison County. Mrs. Williams said that she simply signed the petition to appoint a guardian and never questioned Mr. Blackmon about residency on their trip from Canton to Jackson, where both she and Mr. Blackmon appeared before the Hinds County Chancellor for approval of the settlement. Mrs. Williams added that she did not discuss residency during the half-hour meeting with Mr. Blackmon prior to leaving for Jackson.
Both the petition to appoint the guardian and the petition for authority to settle a doubtful claim alleged that Mrs. Williams and her minor son, Johnny Earl, were residents of Hinds County. There is no indication, however, that Mrs. Williams was a resident of or lived in Jackson or Hinds County. Moreover, testimony revealed that the address allegedly given by Mrs. Williams to Sandra McElroy was for Johnny Earl only and not for Mrs. Williams even though the petitions alleged otherwise.
Immediately following the hearing on the petition for appointment of guardian, the chancellor signed a decree authorizing the *170 appointment of guardian and letters of guardianship were issued to Mrs. Williams to act as guardian for Johnny Earl. After being appointed guardian, Mrs. Williams signed in the presence of Mr. Blackmon and before a deputy chancery clerk of Hinds County a petition for authority to make complete and final settlement of doubtful unliquidated claims and to execute an absolute release with covenants. This petition also included her representation that both she and her son Johnny Earl resided in Hinds County. After considering the petition and the release, the Chancellor then signed the order authorizing settlement.
The provisions of the settlement included a $310,000 lump sum cash payment to be made to partially settle Johnny Earl's claim against the defendants in conjunction with a structured settlement. The total structured settlement amounted to $420,000 and included a guaranteed term providing for the payment of $1,000 per month to Johnny Earl for ten (10) years and $1,250 per month thereafter for twenty (20) years. Additionally, Johnny Earl was going to receive $1,250 per month for any time he lived after the expiration of the guaranteed portion of the structured settlement.
Out of the $310,000 cash payment, Mr. Blackmon received $275,000 in attorney's fees with the remaining $35,000 paid to satisfy Johnny Earl's outstanding medical and hospital bills which Mr. Blackmon had negotiated down from $126,000. Consequently, neither Mrs. Williams nor Johnny Earl received any monies from the cash settlement.
Mr. Blackmon's percentage was calculated on the basis of the guaranteed portion of the structured settlement which amounted to a total of $730,000. His fee amounted to thirty-eight percent (38%) of the guaranteed portion of the settlement. No consideration was given to the present value of the settlement nor the cost of the annuity that was required to be purchased by the defendants in order to fund this structured portion of the settlement which was the method previously suggested by Mississippi State Bar in situations of this nature. Mrs. Williams testified that no discussion occurred between her and Mr. Blackmon with regard to how the attorney's fees would be calculated. The contingency fee employment contract entered into by Mrs. Williams and Mr. Blackmon failed to address how the attorney's fees would be calculated in the event that a structured settlement was reached.
Despite this fact, Mr. Blackmon requested $275,000 in attorney's fees based on the $730,000 guaranteed portion of the settlement. The chancellor accepted Mr. Blackmon's justification and awarded the requested amount.
At the hearing before the Hinds County chancellor, Mr. Blackmon submitted the life expectancy calculations of Mississippi State University Economist Larry Earl White to substantiate the reasonableness of the settlement. He also proffered to the chancellor summaries of witnesses' testimony regarding Johnny Earl's case. Although Mr. Blackmon had available the depositions of Dr. James L. Hughes, Johnny Earl's treating physician, and Dr. Hughes medical reports, no doctors testified before the chancellor. In fact, no witnesses other than Mrs. Williams and Mr. Blackmon testified; no witness to the accident testified; no attending or treating physician; no doctor's reports were introduced as exhibits in the record of the hearing; no attorneys testified concerning the reasonableness of the attorney's fees asked to be approved; none of Johnny Earl's attorneys testified, on the record, with regard to the quantity or the quality of services they performed or how they spent the time representing Johnny Earl that would justify awarding a $275,000 fee out of the lump sum cash payment.
Following the chancellor's decree authorizing the settlement, Mrs. Williams became concerned that she was not receiving any money from a lump sum payment which was exhausted after the payment of the attorney's fees and medical expenses. She consulted another attorney, Ross Barnett, Jr., who filed a motion to set aside appointment of guardian, and to authorize final and complete settlement of doubtful unliquidated execution of absolute relief *171 with covenants which included the award of $275,000 in attorney's fees. Ultimately, Mr. Blackmon in conjunction with his co-counsels, Mr. Smith and Mr. Nichols, refunded $75,000 in attorney's fees to the guardianship of Johnny Earl Brown. Thus, the total amount of attorney's fees received by Mr. Blackmon was reduced to $200,000. Of the $75,000 reduction of attorney's fees, the firm of Blackmon and Smith and Attorney George Nichols paid $50,000 while Edward Blackmon, Jr. alone paid the remaining $25,000 in five (5) $5,000 installments. According to Mr. Blackmon, his attorney's fees, after the reduction and other case expenses, resulted in a reduced individual attorney's fee for him of approximately $44,101.87.

LAW
"The Supreme Court of Mississippi (the Court) has exclusive and inherent jurisdiction of matters pertaining to attorney discipline, reinstatement, and appointment of receivers for suspended and disbarred attorneys... ." Rules of Discipline for the Mississippi State Bar 1 (1984). Therefore, when the Court reviews disciplinary matters, it "reviews the evidence de novo, on a case-by-case basis, sitting as triers of fact, and no substantial evidence or manifest error rule shields the Tribunal from scrutiny." Foote v. Mississippi Bar Ass'n, 517 So.2d 561, 564 (Miss. 1987) (citing Hoffman v. Mississippi State Bar Ass'n, 508 So.2d 1120, 1124 (Miss. 1987)). See also Mississippi State Bar v. Nichols, 562 So.2d 1285 (Miss. 1990); Steighner v. Mississippi State Bar, 548 So.2d 1294 (Miss. 1989).

I. WHETHER THE COMPLAINT TRIBUNAL ERRED BY FAILING TO FIND THAT EDWARD BLACKMON, JR. HAD CHARGED AND COLLECTED AN EXCESSIVE AND UNREASONABLE ATTORNEY'S FEE IN VIOLATION OF DR2-106(A AND B) OF THE CODE OF PROFESSIONAL RESPONSIBILITY IN HIS REPRESENTATION OF JOHNNY EARL BROWN, A MINOR.
Forty percent (40%) of the guaranteed portion of the structured settlement amounted to $292,000. Mr. Blackmon, however, asked for and was awarded $275,000 which amounted to thirty-eight percent (38%) of the guaranteed portion of the structured settlement. Nevertheless, according to the Bar, if Mr. Blackmon's attorney fees were calculated upon the total gross approximate value of settlement ($548,790.00), he would have been awarded only $219,516 under the terms of his contract. If his forty percent (40%) had been figured on the net approximate value of the settlement, he would have been awarded only $207,516.
Mr. Blackmon refunded $75,000 to Mrs. Blackmon of which Mr. Barnett's fee amounted to $25,000. The reduction of the fee to $200,000 resulted in an award equal to 27% of the guaranteed settlement or 36.44% of the cost of the total gross approximate value of the settlement. This is more than 3% less than the 40% provided for in the contract. If there is included the $25,000 paid to Mr. Barnett in the attorney's fees then the percentage rises to 41% of the cost of the total gross approximate value of the settlement, or 1% over the 40% agreed to by the parties.
The Bar contends that the fee was calculated in violation of the considerations set forth in DR2-106(B) of the Code of Professional Responsibility. Those eight factors include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.

*172 (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is contingent or fixed.
DR2-106(B) of the Code of Professional Responsibility.
In June of 1985, at the time of the hearing before Chancellor Moss, Ethics Opinion No. 92 had been in effect for over fifteen (15) months. In it the Board of Bar Commissioners of the Mississippi State Bar addressed the subject of how attorney's fees should be calculated in cases involving structured settlements, strongly urging that the attorney and his client reach an agreement in advance as to how the fee is to be handled. With regard to the structured settlement itself, the opinion views the settlement as a situation where the defendant invests money for the plaintiff's future. Accordingly, the Committee felt that the lawyer could not share in later payments made pursuant to the agreement because the lawyer should not expect to share in the client's future income. In light of this opinion, the contingent fee should be based on either the present value of the settlement or the cost of it to the defendant, whichever the lawyer and the client agreed upon.
Mr. Blackmon stated that he was unaware of this Ethics Opinion and admitted that he failed to follow its strong suggestions. As a practicing attorney Mr. Blackmon had an obligation to his clients and to the bar to be aware of the opinion. He would then have been aware that the proper procedure and the better practice would have been to prepare the contract to take into account the possibility that a structured settlement might be reached. Then, once a structured settlement had been reached included, Mr. Blackmon should have calculated his contingency fee according to the manner prescribed in Ethics Opinion No. 92.
We are not proscribing a 40% contingency fee as being excessive, nor are we suggesting that a 40% contingency fee is appropriate, rather we are prescribing the method by which the percentage should be calculated. The question is whether Mr. Blackmon's failure to follow the suggested procedure was misconduct warranting discipline. We think so. Accordingly, we order an additional public reprimand be entered for failure to calculate attorney's fees in the appropriate manner.

II. WHETHER THE COMPLAINT TRIBUNAL ERRED WHEN IT FAILED TO IMPOSE DISCIPLINE MORE SEVERE THAN A PUBLIC REPRIMAND ON EDWARD BLACKMON, JR. FOR HIS VIOLATIONS OF THE CODE OF PROFESSIONAL RESPONSIBILITY.
The Bar contends that Mr. Blackmon overcharged his client by at least $75,000 and consequently, should receive a public reprimand for this conduct alone. However, because the Complaint Tribunal found that he violated additional rules of conduct, a finding which Mr. Blackmon does not dispute, the Bar seeks a more severe sanction.
Mr. Blackmon argues that the Tribunal lacked clear and convincing evidence that he had concealed or knowingly failed to disclose, knowingly used false evidence, or knowingly made false statements. Additionally, he argues that the ruling is inconsistent with the finding that his misconduct was not motivated by willful or fraudulent intent.
The evidence clearly demonstrates that Mr. Blackmon knew or should have known that Mrs. Williams and her son Johnny Earl Brown were at all times residents of Madison County. Even when proceedings were filed with the Hinds County Chancery Court, Mr. Blackmon had an opportunity to correct the error but did not do so. There remains the question of whether or not his actions were intentional. The Tribunal found that they were not. Rather, the Tribunal found that, although Mr. Blackmon knew or should have known his clients' residency, he negligently failed to state their address properly or correct the error. This Court has complete authority to hold otherwise. The Bar would have this Court find that "Mr. Blackmon's violations *173 rise to the level of culpability to be considered a per se violation of the Code of Professional Responsibility."
Specific intent to violate a rule is not required for this Court to impose sanctions. Vining v. Mississippi State Bar, 508 So.2d 1047, 1049 (Miss. 1987). The Court possesses the authority not only to find as the Bar suggests but also to impose a more severe sanction than imposed by the Complaint Tribunal should it deem greater discipline appropriate notwithstanding a decision as to whether Mr. Blackmon charged an excessive fee. Foote v. Mississippi State Bar Ass'n, 517 So.2d at 564.
The Bar seems to concede that Mr. Blackmon's actions were negligent or based on ignorance of an existing Ethics Opinion. It relies necessarily on three opinions by the Court where attorneys were sanctioned for conduct that was not intentional, dishonest or fraudulent, but negligent. Fougerousse v. Mississippi State Bar, 563 So.2d 1363 (Miss. 1990) (attorney who defaulted in his representation of two separate clients received a 90-day suspension); Steighner v. Mississippi State Bar, 548 So.2d 1294 (Miss. 1989) (attorney who continuously neglected a medical malpractice case, failed to respond to a Motion for Summary Judgment, and mislead his client received a 180-day suspension); Vining v. Mississippi State Bar, 508 So.2d 1047 (Miss. 1987) (attorney who neglected client's case and allowed statute of limitations to run received a 120-day suspension).
In determining what discipline, if any, is appropriate we look to several factors. These factors include: (1) the nature of the misconduct involved; (2) the need to deter similar misconduct; (3) the preservation of the dignity and reputation of the profession; (4) the protection of the public; and (5) the sanctions imposed in similar cases. Mississippi State Bar v. A Mississippi Attorney, 489 So.2d 1081, 1083 (Miss. 1986). Additionally, the ABA has approved a set of standards for imposing lawyer sanctions which includes the following factors a court should consider when imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.
While the Court declines to prescribe a greater sanction than the public reprimand, we find that Mr. Blackmon's conduct with regard to the fee charged as well as his failure to properly investigate his clients' address, a very simple task in this case, warrants public reprimand at a minimum. Accordingly, (1) the Complaint Tribunal's recommendation of a public reprimand with regard to the failure to investigate is affirmed. In addition, (2) we hold that a public reprimand issue for Mr. Blackmon's failure to calculate his fee in the appropriate manner resulting in an excessive fee charged.

CROSS APPEAL
Mr. Blackmon cross-appeals arguing that an appeal by the Mississippi State Bar to enhance his punishment violates his rights under the Fifth and Fourteenth Amendments under both the United States and Mississippi constitutions. Based upon United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), Mr. Blackmon contends double jeopardy bars the Bar's appeal to this Court to enhance the sanctions imposed by the Complaint Tribunal. In Halper, the manager of a medical laboratory company submitted false claims for reimbursement under the federal Medicare program resulting in $585 in overpayment. He was discovered and received a criminal conviction of two years imprisonment and a $5,000 fine for violating a federal statute which allowed for a criminal penalty. In addition, however, the federal government brought a civil action under the False Claims Act in which it sought an authorized recovery of more than $130,000. Mr. Blackmon quoted the Supreme Court correctly when he stated "a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." Id. at 448, 109 S.Ct. at 1901. Mr. Blackmon failed, however, to correctly apply the holding. Had he continued *174 reading he would have discovered that the Supreme Court held "that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." Id. at 448-49, 109 S.Ct. at 1901-02 (emphasis added). Further, the Supreme Court held that "[n]othing in today's ruling precludes the Government from seeking the full civil penalty against a defendant who previously has not been punished for the same conduct, even if the civil sanction imposed is punitive." Id. at 450, 109 S.Ct. at 1903. Therefore, Double Jeopardy does not bar disciplinary sanctions even if punitive in nature.
This Court has not yet addressed this issue, although Mississippi State Bar v. Young, 509 So.2d 210 (Miss. 1987), placed it before the Court. The Court did not decide the question in Young, but suggested that should double jeopardy apply to disciplinary matters, Young would violate no double jeopardy rights. Id. at 213-14. Likewise, the Bar's appeal now before the Court does not violate Mr. Blackmon's rights under double jeopardy. Logic dictates that should double jeopardy bar matters such as the one now before the Court that all disciplinary appeals by the Bar would be barred.
Mr. Blackmon also argues that because the Bar did not raise the issue of punishment prior to appeal it is now estopped from doing so. To support this contention, Mr. Blackmon cites Miss. Code Ann. § 73-3-325 (Supp. 1989) which provides that in proceedings before Complaint Tribunals to hear allegations of attorney misconduct, "[t]he rules of evidence and procedure applicable to and followed by the chancery courts of Mississippi shall apply to such hearings." Consequently, he contends questions not raised in a trial court may not be considered on appeal. See Allgood v. Allgood, 473 So.2d 416, 423 (Miss. 1985); Seaney v. Seaney, 218 So.2d 5, 7 (Miss. 1969).
Though this is a correct statement of the law, Mr. Blackmon failed to note Rule 29 of the Rules of Discipline for the Mississippi State Bar. Rule 29 provides that the Rules of Discipline supersede all other rules or statutes pertaining to attorney discipline. This encompasses Rules 1 and 9.4 which provide that "[t]he Supreme Court of Mississippi (the Court) has exclusive and inherent jurisdiction of matters pertaining to attorney discipline, reinstatement, and appointment of receivers for suspended and disbarred attorneys ...," and may render any order it deems appropriate. Accordingly, Mr. Blackmon's argument fails.
Mr. Blackmon also suggests that the tribunal's ruling concerning pre-trial discovery and evidentiary matters denied him due process and fundamental fairness as guaranteed by the federal and state constitutions. Mr. Blackmon offers three arguments in support of this assignment of error: (1) he was denied his right to depose various members of the Committee on Professional Responsibility who had voted to issue a formal complaint; (2) Mrs. Williams's attorney, Ross Barnett, Jr., was improperly allowed to invoke the attorney/client privilege existing between his client and him; and (3) testimony referring to guardianship issues that were not part of the Formal Complaint was improperly allowed.
First, Rule 7(a) of the Rules of Discipline of the Mississippi State Bar mandates that the Committee on Professional Responsibility serves in the capacity of a Grand Jury in matters of attorney discipline. Just as it is impermissible to question members of a grand jury about their deliberations, it is likewise improper to question members of the Committee on Professional Responsibility to discover why they made particular decisions.
Secondly, Mr. Blackmon complains that Mr. Barnett refused to answer questions regarding Mrs. Williams's statement to Mr. Barnett. Mr. Barnett claimed attorney/client privilege with regard to questions regarding the question of whether or not Mr. Blackmon had asked Mrs. Williams to lie about her residency. Mr. Barnett *175 admitted that the statements were made in the presence of Bob Montgomery. Thus, the statements by Mrs. Williams were made to her attorney in the presence of a third person. While it may have been error to allow Mr. Barnett to claim privilege, the error in this instance was harmless. The Tribunal found that Mr. Blackmon did not act intentionally, rather he acted negligently. The evidence supports such a finding. Accordingly, Mr. Blackmon was not harmed by this error.
Lastly, Mr. Blackmon complains that the Bar presented testimony "with reference to guardianship issues which were not made a part of the formal complaint ..." Mr. Blackmon fails to delineate that testimony and only states that admitting the testimony was "so prejudicial as to taint the judgment of the Complaint Tribunal." Likewise, Mr. Blackmon fails to inform the Court of how the testimony tainted the Tribunal. Accordingly, it is difficult, if not impossible, for us to evaluate the validity of this argument. Therefore, absent a clear showing of prejudice, we hold, the error, if any, was harmless.

III. WHETHER THE PROSECUTION OF EDWARD BLACKMON THROUGH A DISCIPLINARY SYSTEM WHICH SYSTEMATICALLY EXCLUDES BLACK ATTORNEYS FROM THE DISCIPLINARY PROCESS, EXCEPT AS RESPONDENTS, VIOLATED EDWARD BLACKMON'S DUE PROCESS, EQUAL PROTECTION AND FUNDAMENTAL FAIRNESS RIGHTS GUARANTEED UNDER THE UNITED STATES AND THE STATE OF MISSISSIPPI CONSTITUTIONS.
Mr. Blackmon alleges that he "did not obtain a fair and impartial hearing before the Mississippi State Bar because of the systematic exclusion of Blacks from all disciplinary boards, except for one appointee to the Complaints Committee during the period 1979 to 1986 and three recent appointees to the Complaint Tribunals." Mr. Blackmon likens this alleged discrimination to the principle recognized in Ford v. Hollowell, 385 F. Supp. 1392 (S.D.Miss. 1974), which dealt with the systematic exclusion of Blacks from juries.
Mr. Blackmon offers support for his allegation through the testimony of Bennie Turner, Firnist Alexander and Ellie Fortner. Additionally, Mr. Blackmon offers statistics that demonstrate that out of twenty-two (22) members on the Complaints Committee only one (1) member was of the Black race during the period from 1974 through 1986. Out of 4,700 practicing attorneys in Mississippi only 220 or 4.5% are Black attorneys, but less than 1% of the disciplinary boards and committees are Black.
The Bar responds by citing An Attorney v. Mississippi State Bar, et al., Civil Action No. J88-0457(B), 1988 WL 146352. The case involved the question of whether the Mississippi disciplinary proceedings discriminated against Black attorneys. The United States Magistrate sustained the Bar's motion to Remand Disciplinary Proceedings to the supervision and regulation of the Mississippi Supreme Court, leaving the dispute to this Court. In granting the motion the Magistrate chose to refrain from resolving the disciplinary proceeding.
The issue is whether Mr. Blackmon received a fair hearing. Under the facts of this case, and the Court looks at each case on a case-by-case basis, it seems clear that Mr. Blackmon received every fairness and guarantee that should be afforded to all people.
The Complaint Tribunal's recommendation for a public reprimand because of Blackmon's failure to investigate is approved and it is further ordered that a second public reprimand be entered for failure to calculate attorney's fees in the appropriate manner.
AFFIRMED.
HAWKINS AND DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, and PITTMAN, JJ., concur.
BANKS, J., dissents with written opinion to follow.
McRAE, J., not participating.
*176 BANKS, Justice, dissenting:
This matter involves an area that often causes confusion to the general public and is ripe for definitive rules promulgated by this Court. In the absence of such definitive rules, I believe that Edward Blackmon has been unfairly and selectively prosecuted. I also believe that a fee slightly in excess of fee initially charged is calculable on these facts within the meaning of the "suggested" procedure from the state bar referred to by the majority. Finally, I believe that the Court pays insufficient attention to an argument based on compelling facts concerning the selection process for those who would administer our disciplinary proceedings. I, therefore, must dissent.

I
Certain facts are undisputed. Three lawyers, not one, were engaged to represent the injured party in the proceedings leading to this controversy. At least two lawyers participated in the decisions here deemed violative of our standards of conduct, and all three shared in the proceeds. One lawyer, Edward Blackmon, was chosen by the state bar association for prosecution. The decision to prosecute was contrary to the recommendation of the complaints counsel who investigated this matter. It seems to have been instigated solely to appease the press after the matter of the fee charged was reported in a less than accurate and inflammatory manner.[1]
The Complaints Tribunal found no deliberate wrongdoing on the part of Edward Blackmon. Evidence of his exemplary character and ability was un-rebutted. It found that he had not charged an excessive or unreasonable fee. The tribunal did find that he negligently misrepresented the county of residence of his client to the Chancery Court of Hinds County. For the negligent misrepresentation, the complaints tribunal recommended a public reprimand. Understandably weary of the extended litigation over this matter, Blackmon agreed to end the matter there. The complaints counsel recommended against appeal. Nevertheless, the bar association pressed forward for an adjudication of misconduct regarding the fee and for additional unspecified sanctions.
It is the matter of the fee which received the publicity. The tribunal's disposition with regard to the fee is that with which the bar alleges dissatisfaction. The majority has accepted the position of the bar with regard to the fee. It is important then to examine this fee in perspective.

II
Contingent fees, though controversial, play an important role in our system of dispute resolution. It has long been recognized that there is a need for "private attorneys general" to address problems and ills not readily given redress in any other manner. That an incentive in the form of a fee serves that need is a point long since accepted.
We have few general guidelines regarding contingency fees. Fees as high as fifty percent are commonly charged. We might judicially note a once prevailing standard contract of one-third, if the claim is settled without suit, forty percent where suit is filed and fifty percent where the case actually goes to trial. It is more typically stated now as forty percent through trial and fifty percent, if an appeal is taken. Often, in times past, the percentage was applied to the gross proceeds of the recovery before even legal expenses related to the recovery are deducted. See Koehring Company v. Hyde Construction Co., 236 So.2d 377 (Miss. 1970) (Former bar president testifies that litigation expenses are usually, but not always, deducted before application of the percentage); Manzo v. Dullea, 96 F.2d 135 (2nd Cir.1938) (Absent contract providing otherwise, litigation expenses need not be deducted). Routinely, the fee is applied to the recovery without reduction for medical or other expenses *177 which are presumably a part of what is recovered.
In Koehring Company, we held that "a proper and fair contingent fee ... should not exceed fifty percent of net recovery." Id. at 387. "Net recovery" as the term is used in Koehring Company means net of the expense of collection. Id. at 386; See generally, 7A C.J.S. Attorney and Client § 322 (1980). Contrary to any inference to be drawn from what we said in Mississippi State Bar v. Moyo, 525 So.2d 1289 (Miss. 1988), the amount of recovery is generally not reduced by amounts for which the client may be liable, including medical expenses, or which may constitute a lien on recovery, such as Workers' Compensation receipts. See, e.g. U.S. Fire Insurance Co. v. Hill, 209 So.2d 440 (Miss. 1968) (Attorneys allowed one-third of amount collected and the balance applied to Workers' Compensation lien until it is paid.); Manzo, 96 F.2d 135. (Amount withheld from proceeds of fire insurance policy to satisfy mortgage on property not excluded before application of the agreed upon percentage for attorney's fee).
This case involves a structured settlement which creates special problems of valuation for purposes of assessing the amount of the fee. We have established no mandatory guidelines for calculating such fees. The Mississippi State Bar has issued an opinion suggesting that the matter is governed by contract and by the general standard of reasonableness. Ethics Opinion No. 92. That opinion suggests that a lawyer not expect to receive a portion of future payments and that the fee should be calculated on the present value or the cost of the entire settlement.
The uncontradicted evidence of record establishes that the total recovery over the life expectancy of Johnny Earl Brown is $1,000,900. In addition to that, Blackmon negotiated a forgiveness of medical expenses in the amount of $91,000. Normally, the medical expenses would have been paid from the proceeds to the client after attorneys' fees. The compilation done by the economist, relied upon by all concerned, suggests that the present value of the lump sum and stream of income through Johnny Brown's life expectancy is $601,518 using a 7.35% interest rate and $609,458 using a five percent interest rate.
The bar suggests that the fee should be limited to the guaranteed portion of the settlement and that the "gross"[2] amount of that is $548,790. At forty percent that would be $219,516 in attorneys fees. Nothing in the contract deprives his attorneys of a fee for that portion of the settlement that Johnny Earl Brown will receive, should be live out his actuarily expected life. Theoretically, Brown has as much chance of living beyond his life expectancy and thus receiving more money as he has of expiring earlier and receiving less from the settlement. The bar's selection of the guaranteed portion of settlement is not mandated by the contract, by any rule or by Opinion 92.
Nor does the bar make any provision for treating Blackmon's efforts in negotiating a reduction in medical expenses to be borne by Brown. Such efforts have been viewed as compensable to an attorney with a contingent fee contract. See Magriplis v. Mr. Bar-B-Q, 196 N.J. Super. 238, 482 A.2d 54 (1984) (Attorney entitled to percentage of negotiated reduction of lien for medical expenses with or without agreement of client). Pacillo v. Harris Mfg. Co., 440 A.2d 1168 (N.J. Super. 1981) (Compromise of Worker's Compensation lien results in increased fee.) That $91,000 is "received" and should be counted at full value. It raises the total value of the settlement to $692,518 when combined with the figure derived by using the higher interest rate.[3] *178 Applying forty percent results in a fee of $278,007.
Thus it should be clear that the fee charged is not in excess of a reasonable reading of the contract and its application to the various elements of the recovery received. Moreover, contrary to the holding of the majority, it is not in excess of a fee derived by applying the suggested method of calculation in Opinion 92. Clearly, no sanction should flow from an account of any alleged deviation from the terms of the agreement. This leaves only the second aspect of the bar's attack on the fee, the failure of the chancellor to adequately explore the "reasonableness" of the fee.
In this regard, it should be noted that not one but two chancellors have found that the fee charged is reasonable. That is no chancellor has found fault with charging a forty percent fee. Nor has this Court found fault with a forty percent fee. The majority explicitly eschews faulting Edward Blackmon for any failings on the part of the two chancellors to adequately apply the approved standards for determining the reasonableness of that percentage in these circumstances, and appropriately so. Certainly no discipline should flow from a fee approved by the courts of this state, absent a showing that the courts were misled by the beneficiary of the fee with respect to some fact relevant to a determination of reasonableness. No such showing was made or attempted here.
The tribunal's finding that Blackmon did not charge an excessive fee in violation of the standards of conduct expected of an attorney expresses a sound view of the evidence before this Court. It is a view with which I agree. If this court believes that the prevailing scales for contingent fees are unreasonable or that some other standard than "not more than fifty percent of net recovery" should be set, then we should adopt guidelines. Lawyers should not be left to the whim and caprice of the state bar or this Court based on ex post facto determinations.

III
Blackmon appeals the recommendation of the tribunal that he be sanctioned by public reprimand for negligently failing to ascertain the true facts as to the residence of his minor client. The majority approves that finding and sanction. It is undisputed, however, that Blackmon was supplied with information as to Johnny Brown's residence by his then partner, Ferr Smith. We have noted that attorneys rely, and are entitled to rely, on the representations of other attorneys in performing their duties. See Bean v. Broussard, 587 So.2d 908 (Miss. 1991). Assuming, arguendo, that Blackmon was negligent in failing to investigate personally based on his knowledge that Mrs. Williams was a life long resident of Canton, such negligence, in my view, does not rise to the level of sanctionable conduct. To the extent that it could be deemed a transgression of our standards of conduct justifying discipline, an informal admonition or, at most, a private reprimand would suffice. See The Mississippi Lawyer, Private Reprimand-Misc. No. 205 (September-October 1986).

IV
Because I believe that Edward Blackmon should prevail on the merits as to both the appeal and his cross-appeal, the procedural issues need not be treated. I am compelled to note, however, that an allegation that the bar systematically excluded black attorneys from participating in the disciplinary process during the times applicable to the proceedings presently before the Court cannot be disposed of, as the majority attempts to do, by simply noting that "Mr. *179 Blackmon received a fair hearing." Opinion, ante, at p. 175.
The Bar's reliance on An Attorney v. Mississippi State Bar, Civil Action No. J88-0457(B), 1988 WL 146352 wherein the federal court declined jurisdiction based on the abstention doctrine is so obviously misplaced as to not warrant discussion.
As noted by the majority, the Committee on Professional Responsibility functions "as a grand jury in matters of attorney discipline." Rule 7(a), Rules of Discipline for the Mississippi State Bar. The United States Supreme Court "has repeatedly rejected all arguments that a conviction may stand despite racial discrimination in the selection of the grand jury." Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), (citing its previous decisions dating back to 1881).
[D]iscrimination on the basis of race in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," and ... the criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded.
Id. 474 U.S. at 262, 106 S.Ct. at 622.
Surely, purposeful discrimination in the selection of our Committee on Professional Responsibility, if proved, would invalidate any charge of misconduct originating with that committee. Lawyers are also entitled to the equal protection of the laws.
As noted by the majority, Blackmon argues that although African Americans number about 4.5% of the active members of the bar, only 1% of the members of the bar's committees have been black. The Bar, using statistics that include all persons admitted to the bar, whether or not in active practice, asserts that African Americans are approximately 3.8% of the bar and that, coincidentally, the one African American member of the complaints committee during the period cited by Blackmon comprised 3.8% of all members during that period.
The Bar makes much of the fact that the disciplinary procedures are approved by this Court. We, of course, should not view ourselves as immune from valid charges of discrimination in our selection processes. Indeed, I believe that the majority, if not the entire Court, appreciates the responsibility of this Court to monitor its own conduct with a view toward eliminating any real or apparent discrimination.
Statistics talk, and when they do courts usually listen. State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir.1962). Zero is a compelling statistic. The testimony was that prior to 1986 only one African American served on the Complaints Committee and none served on a Complaints Tribunal. Although, there is no testimony regarding the statistical significance of the numbers in the record, there is much anecdotal evidence to the effect that the bar association, here as elsewhere in our nation, has, in times past, been less than welcoming to African American lawyers.
In summary, I believe that Edward Blackmon should prevail on the merits. Failing that I suggest that his argument that, by being subjected to discipline by a process tainted by systematic exclusion, he has been deprived of his right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article 3 section 14 of the Mississippi Constitution has merit.
NOTES
[1] The Clarion Ledger reported in its headline that Blackmon had received 89% of the settlement proceeds implying erroneously that the lump sum portion of the settlement was the entire amount received by Johnny Earl Brown. The newspaper later printed a "Clarification."
[2] The bar suggests that the "net" amount of the recovery is $30,000. less than this "gross" amount. That figure is derived by dividing its suggested "net" amount attorneys' fee by .40. The derivation of this net figure is not readily apparent to the writer. One can only speculate that the intent was to reduce the cash value of the recovery by the $35,000 in medical expenses to be paid. As explained in the text, no such reduction should be made before applying the attorneys' fee percentage, the apparent contrary language in Moyo notwithstanding.
[3] In fairness to the majority, who voted before seeing this opinion, and to make clear that its decision is not a rejection of the author's treatment of the negotiated reduction of medical costs with regard to the contingent fee, I note that this treatment was not presented by the parties at any stage of the proceedings at the trial or appellate level. Blackmon's failure to urge this analysis of the value of settlement should not deter our consideration of it, however. It is fairly clear from the record that the fee arrived at was an approximation of a proper application of the agreed upon percentage to the value of the settlement. An accurate approximation is no less so because the lawyer fails to articulate every available basis to support it. The question here is whether the fee can be fairly viewed as within that agreed to by the parties.