678 So.2d 963 (1996)
ATTORNEY U
v.
THE MISSISSIPPI BAR.
No. 92-BA-01201-SCT.
Supreme Court of Mississippi.
June 20, 1996.
*964 James A. Becker, Jr., Leah D. McDowell, C. Maison Heidelberg, Watkins & Eager, Jackson, Myles A. Parker, Jackson, for Appellant.
Michael B. Martz, Jackson, Charles J. Mikhail, Pascagoula, for Appellee.
En Banc.

ON PETITION FOR REHEARING
JAMES L. ROBERTS, Jr., Justice, for the Court:[1]

INTRODUCTION
The petitions for rehearing are granted. Original opinions are withdrawn and these opinions are substituted therefor. This case is reversed and rendered, as it is now determined that all issues are finalized.
In this matter we are presented with the opportunity to define the point at which a member of the bar has sufficient knowledge concerning an unprofessional act of another member of the bar to be compelled to report that knowledge to the disciplinary authority. The range to be considered stretches from "any information" to "personal knowledge" sufficient to qualify one as a witness under our rules of evidence. M.R.E. 602. We opt for a line short of the latter but considerably beyond the former. In the instant case, wherein the charged lawyer's client related a story concerning his relationship with another lawyer which indicated fee-splitting, we are unable to conclude that the line was crossed. Further, we find that supplemental additional information within the record reflects that the previously remanded issue regarding improper "threats of a bar complaint to exact a settlement" was originally dismissed by the Committee on Professional Responsibility and never forwarded to the Complaint Tribunal due to the Committee's finding of a lack of probable cause to support said violations. Accordingly, we now determine this lengthy matter concluded.

I.
Pulmonary Function Laboratory (PFL) began performing pulmonary function testing and other similar services for clients of Attorney S in 1988. The details of their agreement are unclear. At the time this action was commenced there still existed a dispute between William T. McNeese, part owner of PFL, and S as to the exact financial agreement between the two of them.
In the summer of 1989, a dispute arose between S and McNeese over the amount of money S was to pay PFL. To aid them in settling this dispute, both parties obtained legal counsel with S hiring Frank Trapp and McNeese hiring attorney U. According to U, soon after he began representing McNeese, McNeese brought him a writing which he said was a proposed contract which provided for a splitting of legal fees between PFL and, at that time, an unidentified attorney. The terms of the proposed contract, as alleged by McNeese, provided that McNeese and S were to split evenly $175 of a $400 fee for each client. U advised McNeese that the proposed agreement, as written, was unenforceable because it violated the Rules of Professional Conduct. U then prepared for his client McNeese a "substitute contingent fee agreement to be used between PFL and individuals it tested and for whom it performed *965 other services who could not afford to pay for them, not with the attorney."
In September, 1989, McNeese told U that PFL had been operating under an oral fee-splitting agreement with S for several months and that S was now denying the existence of the agreement and disputing the amounts owed PFL under it. McNeese also told U "that Trapp was representing S in this dispute; and that Trapp, on behalf of S, had suggested a flat fee arrangement, though the parties were not able to agree on the amount."
There followed a series of letters between U and Frank Trapp. In a letter to Trapp dated October 10, 1989, U wrote the following:
I am advised that since February 19, 1988, 1,061 clients of Mr. [S's] have been given pulmonary function tests by Pulmonary Function Lab, and that all of these clients were referred to Mr. [S] by the lab. Pulmonary Function Laboratory had agreed with Mr. [S] to finance the testing for Mr. [S], that is, to perform the testing and to pay any medical cost involved for x-rays, physical examinations by physicians, as well as any cost involved in further evaluation or medical consultation, further x-ray readings, further physical examinations, etc. In return for handling the financing of the medical end of the cases, Pulmonary Function Laboratory was to receive one-half of any fees realized by Mr. [S] from the cases, as well as reimbursement of some of the medical costs. At that time, of course, Pulmonary Function Laboratory neither knew, nor had reason to know, of the provisions of Rule 5.4(a) of the Mississippi Rules of Professional Conduct. Mr. [S] now claims that since the Rules of Professional Conduct applying to him as a lawyer prohibit such fee-sharing, he will be unable to fulfill his obligations to Pulmonary Function Laboratory under that agreement.
In order to resolve this controversy, Pulmonary Function Laboratory is willing to do the following:
1. It will waive any claim it may have against Mr. [S] under the verbal contract.
2. Subject to a payment schedule to be agreed upon by the parties, for a flat fee of $4,000 per patient, less a credit of $200 for each patient already tested, Pulmonary Function Laboratory will... .
The letter then goes on to list several services that PFL was to provide under this new proposed agreement. It concludes by saying:
Pulmonary Function Laboratory feels that under this proposal, their compensation will be significantly less than it would have been under the verbal fee sharing arrangement, but will compensate them to some extent for the risk they took in financing Mr. S's venture into asbestos litigation. I have advised Pulmonary Function Laboratory of the availability of the complaint proceedings available through the Mississippi State Bar Association. Unless something can be worked out along the lines of this proposal, it is the intention of Pulmonary Function Laboratory to seek relief through whatever legal avenues are available to it.

(Emphasis supplied.)
U again wrote Trapp on October 27, 1989:
PFL has advised me that they have had discussions with Mr. [S] and that he has agreed to pay a flat testing fee of $4,000 per client, less a credit of $200 for each client already tested by PFL. He has also agreed to renegotiate a twenty-five percent contingent fee with each of his clients previously tested by PFL. Under this flat fee arrangement, once PFL has performed the first retesting on a client, Mr. [S] will be liable for the entire fee in accordance with the payment schedule set forth below. This flat fee is not contingent on the retested person's remaining a client of Mr. [S]'s. For the agreed flat fee, PFL will... .
The letter again enumerates the services mentioned in the letter of October 10, 1989, and proposes a fee payment schedule.
On November 8, 1989, Frank Trapp wrote U:
This letter is written in response to your October 10, 1989 and October 27, 1989 letters. It also is to confirm my conversation *966 with you and [your associate] on October 31, 1989.
First I would reiterate, on behalf of my client, [S], that, without admitting or conceding any arrangement ever existed, he does renounce, declare void and disclaim any arrangement with Pulmonary Functions Laboratory (the "Lab") or Bill McNeese to (1) share legal fees or (2) pay compensation or give anything in connection with the referral of clients who had tests performed at the Lab. Under no circumstances shall Mr. [S] pay the Lab or Mr. McNeese any part of his legal fees. Mr. [S] shall not pay the Lab or Mr. McNeese any compensation or give anything of value for any matter that has transpired before the date of this letter, except the $400.00 fee which his clients agreed to pay to the Lab for their testing and diagnosis.
... .
As we discussed in our meeting, the arrangement as characterized by Mr. McNeese could be held to violate criminal laws. To reiterate, Mr. [S], without admission or concession to the existence of such an arrangement, has now specifically renounced and disclaimed any such arrangement. Again, no payment will be made beyond the $400.00 which each client of Mr. S who was tested by the Lab had agreed to pay to the Lab... .
In order to avoid any appearance of continuing any improper conduct, Mr. S makes absolutely no commitment or promise of future use of the Lab... .
U responded on November 17, 1989:
PFL has advised me that they have no intention of renouncing the fact that there was a fee-sharing arrangement between them and Mr. S. Further, PFL will do no further retesting on any of Mr. S's clients until a flat fee agreement has been negotiated and signed.
As you know, I have advised PFL of its options, including the availability of the complaint proceedings available through the Mississippi State Bar Association. Again, unless something can be worked out along the lines of a negotiated flat fee arrangement, it is the intention of PFL to seek relief through whatever legal avenues are available to it.
Please discuss this with Mr. S and inform us of his decision. If we have not received a response from Mr. S by November 27, 1989, our clients will perform no further retesting on Mr. S's clients and will pursue whatever legal remedies it considers appropriate.
U again wrote Trapp on December 1, 1989:
[My associate] has passed on to me the substance of your various recent telephone conversations. Bill McNeese informs me that the services offered by Mobile Diagnostic Center in no way compare with the nature and extent of the diagnostic and interpretive services offered by Pulmonary Function Lab. Pulmonary Function Lab is not willing to do the retesting for the $435.00 you mentioned to [my associate]. They are willing to extend their retesting period for two years, but the flat fee for providing their services still remains significantly above the figure mentioned by Mobile Diagnostic Center.
This matter has now drug [sic] on for some time. We have been instructed to obtain the necessary forms from the Mississippi State Bar Association for Pulmonary Function Laboratory to proceed with a bar complaint against Mr. S.
(Emphasis supplied.)
The final letter was sent by Trapp to U on December 6, 1989.
I am in receipt of your letter of December 1, 1989. In that letter, you unilaterally announce that Bill McNeese's retesting would only be done at a significant sum above the competitive quote of $423.00 given by a pulmonologist. You did not specify what that "significant" figure is. Also, your letter again couples the demand with a reference to filing a bar complaint.
Mr. McNeese charges the clients of Paul Minor and other lawyers less than the $400.00 fee paid for the initial testing. I ask you: How can Mr. [S] justify having his clients pay a $4,000.00 or other "significantly" higher fee when his clients can obtain the equivalent services for $423.00?, It was at [your associate's] request that we *967 obtained written verification of that quote. Having complied with her request, how can we now ignore that quote?
Everyone recognizes the arrangement alleged by Mr. McNeese would be an unenforceable contract. Moreover, that alleged arrangement runs afoul with the spirit of the runner and champerty statutes. Thus it is clear Mr. McNeese's demand for $4,000.00 per client is either (1) to pay blackmail to keep Mr. McNeese from filing a complaint with the bar association or (2) to pay Mr. McNeese for allegedly referring clients to Mr.[S]. In either case, the payment would be illegal.

Over the past several weeks, I had talked with [your associate] about the situation. I reiterated Mr. [S]'s disavowal of the arrangement alleged by Mr. McNeese... .
Your letter of December 1, 1989 is a unilateral rejection of our good faith effort to come up with a fair fee schedule. Your letter does not state what figure you are referring to that is "significantly above the [$423.00 quote]." I can only assume it is another effort to extract some excessive fee from Mr. [S]. Any payment on that basis would not be legitimate. I cannot advise my client to agree with any fee schedule which is only a guise for an illegal payment.
(Emphasis original.)
U did not reply to this letter. In January, 1990, McNeese filed a bar complaint against S. One year later, in January of 1991, S filed a bar complaint against U. U never filed a bar complaint against S.
S's complaint against U was investigated by the bar's Assistant General Counsel who found that "the evidence does not establish `probable cause' that S violated Rules 1.16(a) (mandatory withdrawal), 1.2(d) (counseling a client to engage in, or assist a client in conduct the lawyer knows is criminal or fraudulent), or 8.4(d) (conduct prejudicial to the administration of justice)." Accordingly, the issue of "threats of a bar complaint to exact a settlement" was determined to be lacking probable cause, thus without merit, and was not forwarded to a Complaint Tribunal to pursue formal charges as required by Smith v. Mississippi State Bar, 475 So.2d 148, 149-50 (1985) and Rule of Discipline 7.1. As the Court is "bound by its own disciplinary rules," The Mississippi Bar v. Attorney G, 630 So.2d 344, 348 (1994), we are unable to properly address the issue of "threats of a bar complaint to exact a settlement" because the Complaints Committee did not file a Formal Complaint with the Clerk of this Court as required by Disciplinary Rule 8(a) and Attorney G.
On March 20, 1992, the Committee on Professional Responsibility of the Mississippi Bar issued a directive to General Counsel to "prepare and file a Formal Complaint against U, in accordance with the provisions of Rule 8 of the Rules of Discipline for the Mississippi State Bar." The complaint was duly filed and the issue joined. This Formal Complaint concerned the alleged failure of U to report professional misconduct.
A motion styled Complainant's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment was filed by the Mississippi Bar on September 4, 1992. This motion asked the Complaint Tribunal to grant either a Motion for Judgment on the Pleadings under M.R.C.P. Rule 12(c) or a Motion for Summary Judgment under M.R.C.P. Rule 56 on the grounds that:
1. The material facts alleged in the Bar's Formal Complaint ... are admitted by [U] in his Answer and Defenses, ... except that he denies personal knowledge of certain facts and denies characterizations by the Bar of the contents of certain letters attached as exhibits to the Formal Complaint, as is more fully argued in the Bar's Memorandum Brief accompanying this Motion; or
2. The pleadings ... and the affidavits of Mr. [U] ... and William T. McNeese, ... show that there is no genuine issue as to any material fact and that the Bar is entitled to a judgment in its favor as a matter of law, as is more fully argued in the Bar's Memorandum Brief accompanying this Motion.
Affidavits by U and McNeese accompanied the Mississippi Bar's motion. In his affidavit, dated February 18, 1991, U stated:

*968 2. When my firm and I were first engaged by Mr. Bill McNeese of Pulmonary Function Laboratory (PFL) we were asked to review a proposed fee splitting agreement between PFL and one or more unidentified attorneys. This was in August 1989. I did not learn at that time that PFL was supposedly operating with any attorney under any such agreement.
3. We expressed our professional opinion about the agreement furnished to us by PFL for review. We prepared a substitute agreement for a contingent fee arrangement between PFL and certain individuals for whom PFL proposed to do testing and to render other services.
4. Thereafter, in September, 1989, I learned for the first time that PFL was (and had been for several months) operating under an oral fee-splitting arrangement with [S]. At about that same time I learned that Mr. [S] was disputing the amount he owed PFL and was disputing the enforceability of the alleged agreement with PFL. Several months later in 1990, I learned that Mr. [S] had supposedly prepared the agreement which McNeese brought to our firm in August, 1989.
... .
7. At all times material hereto, I have been told by PFL and its principals that PFL had an agreement with [S] pursuant to which PFL was to refer persons it tested to [S] for representation in asbestosis claims, was to perform services in addition to mere testing, and was not to be paid for its services until the persons being tested received payment of settlements.
... .
12. I never threatened or coerced either Mr. [S] or his attorney. I never sought to extort anything from either of them. I never told Mr. Trapp or Mr. [S] of any intent to file a bar complaint except as stated in my letters which are exhibits to the complaint.
13. I certainly never personally threatened or otherwise said that I would file a bar complaint against Mr. [S] because I have never known to my personal knowledge that he committed any violation of the Rules of Professional Conduct. In any event, PFL, the party claiming such conduct on the part of Mr. [S], filed a complaint against him within ninety (90) days of telling me of its complaint against Mr. [S].
14. I have not sought at any time material hereto to induce anyone to commit any crime or to violate the Rules of Professional Conduct of the Mississippi State Bar and I have not done so myself.
Parts of McNeese's affidavit, dated February 14, 1991, are also quite illuminating:
2. In August, 1989, on behalf of PFL, a general partnership, I retained [U's firm] to assist the laboratory in formulating a proposed contingency fee contract to be executed between the laboratory and its clients who desired pulmonary function testing, but could not afford to pay for it. I presented the attorneys with a sample contract which they thought was prepared by PFL. I did not tell the attorneys until later that, in fact, the suggested contract had been prepared by Mr.[S].
3. A month or so after retaining [the firm] for that purpose, I later consulted with Mr. [U] and [an associate of the firm] with regard to a dispute between PFL and Mr. [S], an attorney representing some asbestosis claimants, on whom pulmonary function testing had been performed by PFL. That was the first time they were told of Mr. [S]'s involvement in any contract with PFL... .
4. In the course of my discussions with Mr. [U] and [the associate] about the ethical prohibitions of Mr. [S] entering into a fee-splitting arrangement with PFL, as PFL contended he had done, Mr. [U] advised me that if, in fact, such an agreement had existed, it might be the basis for a complaint with the Mississippi State Bar Association against Mr. [S] by PFL.
5. At no time prior to PFL filing a bar complaint against Mr. [S] did Mr. [U] encourage PFL to file such a bar complaint, nor did Mr. [U] advise PFL that it should use the threat of a bar complaint as a means of forcing Mr. [S] to resolve the differences between [sic] he and PFL.

*969 6. Once PFL realized that it had the basis for a bar complaint against Mr. [S], it was my intention to file such a bar complaint... .
7. The first suggestion to PFL that a flat fee agreement might be entered into between Mr. [S] and PFL, in lieu of the prior contingency fee agreement, was made to me by the attorney for Mr. [S]. The $4,000.00 flat fee proposal made on behalf of PFL to Mr. [S] suggested in Mr. [U]'s letter to Mr. Frank Trapp of October 27, 1989, was in lieu of the former agreement and was for services to be provided by PFL over and above the usual pulmonary function testing provided in such cases.
(Emphasis original.)
U filed a cross-motion for summary judgment. In it, he stated that he "did not have knowledge" that S or any other attorney had violated the Rules of Professional Conduct. He further stated that he had no knowledge of a violation of the Rules of Professional Conduct by another attorney that "raised a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects" and that he had no duty to inform the appropriate professional authority of S's alleged conduct.
The day after he submitted his cross-motion for summary judgment, U submitted an affidavit in support of this motion dated September 9, 1992. In it he stated:
2. I make the following statements so the record in this matter will be perfectly clear. (a) I do not now, nor have I ever had, personal knowledge that Mr. S engaged in any conduct which violated any of the Mississippi Rules of Professional Conduct. (b) My only knowledge of Mr. S's conduct is what my client told me. (c) When I first confronted Mr. S's attorney with the "facts" as recited to me by my client, that attorney vehemently denied that his client had engaged in any conduct which constituted a violation of the Mississippi Rules of Professional Conduct. (d) Mr. S's attorney had persisted in that denial and, so far as I know, persists in that denial and, so far as I know, persists in that denial to this day.
3. I have never been told, nor have I otherwise learned, that Mr. S is alleged to have engaged in any conduct prohibited by the Mississippi Rules of Professional Conduct, except his alleged (but steadfastly denied) violation of Rule 5.4(a).
A hearing was held on this matter before the Complaint Tribunal on September 25, 1992. The Tribunal unanimously found that there was no genuine issue of material fact and that U had violated Rule 8.3(a) and 8.4(a) of the Rules of Professional Conduct. U's cross-motion for summary judgment was denied. The Bar's motion was treated as one for summary judgment and granted. Based on its conclusion that a violation had occurred the Tribunal imposed a sanction of public reprimand.
U filed a Notice of Appeal to this Court on November 24, 1992.

II.

a.
This Court conducts a:

de novo review in a bar disciplinary matter which necessarily includes a review of the sanctions imposed. Hoffman v. MS State Bar Association, 508 So.2d 1120, 1124 (Miss. 1987); Myers v. Mississippi State Bar, 480 So.2d 1080, 1089 (Miss. 1985). Deference is accorded the findings of the Complaint Tribunal but this Court "has the non-delegable duty of ultimately satisfying itself as to the facts, and reaching such conclusions and making such judgments as it considers appropriate and just."
Mississippi State Bar v. Varnado, 557 So.2d 558, 559 (Miss. 1990).
Furthermore, although "Bar disciplinary proceedings are quasi-criminal in nature," Attorney Q v. Mississippi State Bar, 587 So.2d 228, 231 (Miss. 1991), "[t]he beyond-a-reasonable doubt standard does not apply; rather, we require an intermediate level of certainty regarding the facts at issue, to-wit; a clear and convincing evidence standard." Id. at 232.

*970 b.
Rule 8.3(a) of the Mississippi Rules of Professional Conduct reads:
A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.
M.R.P.C. Rule 8.3(a).
The central issue here is whether the attorney in question had sufficient knowledge of another attorney's misconduct to require his reporting it to the proper authority. Proper determination of this issue is hampered by Rule 8.3(a)'s failure to define "knowledge." The Official Comment adds nothing at all. "Self-regulation of the legal profession requires that members of the profession initiate disciplinary investigation when they know of a violation of the Rules of Professional Conduct... ." M.R.P.C. Rule 8.3(a), Official Comment. The Terminology section of the Rules does not define "knowledge" but it does define similar terms. "`Knowingly,' `Known', or `Knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." M.R.P.C. Terminology. Nowhere, however, is "actual knowledge" defined. Black's Law Dictionary defines "actual" in part as "a legal term in contradistinction to virtual or constructive... ." Black's Law Dictionary (4th ed. 1968). The term can be definitively viewed only as something other than constructive or imputed knowledge. Black's relates definitions of the term "knowledge" ranging from "acquaintance with fact or truth" to "information and circumstances which engender belief to moral certainty or induce state of mind that one considers that he knows." Id.
This question has rarely been addressed by the courts, and this is the first instance for this Court. We have found but three cases discussing the duty to report, Matter of Lefkowitz, 105 A.D.2d 161, 483 N.Y.S.2d 281 (A.D. 1 Dept. 1984); In re Himmel, 125 Ill.2d 531, 127 Ill.Dec. 708, 533 N.E.2d 790 (1988); and In re Ethics Advisory Panel Opinion No. 92-1, 627 A.2d 317 (R.I. 1993). Unfortunately, all fail to discuss "knowledge."
Various state bar associations through their Ethics Opinions treated the subject. The Maine Professional Ethics Commission of the Board of Overseers of the Bar wrote in 1989, "The lawyer has no duty to report the other lawyer's misconduct to disciplinary authorities unless the lawyer himself has knowledge, based on a substantial degree of certainty, that the lawyer has committed an offense that raises a substantial question regarding his honesty, trustworthiness, or fitness to practice law." Maine Ethics, Op. 100 (1989). The Advisory Committee of the Nebraska State Bar Association has also addressed this issue, writing, "[B]ecause knowledge in the reporting rule means more than a suspicion, a lawyer need not report mere suspicions of code violations." Nebraska Ethics, Op. 89-4, (undated). That opinion does not, however, reach the issue as to what must be reported.
According to the Advisory Opinions Committee of the State Bar of New Mexico:
The duty to report misconduct is mandatory and arises when a lawyer has a substantial basis for believing a serious ethical violation has occurred, regardless of the source of that information. This "substantial basis" test for knowledge of misconduct is intended to be greater than a "mere suspicion" or "probable cause" test. While no duty to report arises without a substantial basis for knowledge of misconduct, a lawyer may choose to report information of misconduct to the appropriate professional authority.
New Mexico Ethics, Op.1988-8 (undated).
The Committee on Professional Ethics of the Association of the Bar of the City of New York gives one of the stricter definitions of knowledge stating, "The degree of certainty required to constitute knowledge under the rule must be greater than a mere suspicion; the reporting lawyer must be in possession of facts that clearly establish a violation of the disciplinary rules." New York City Ethics, Op. 1990-3 (1990). In contrast, the guidelines given by the Committee on Legal Ethics and Professional Responsibility of the Pennsylvania Bar Association appear more *971 subjective  "If the lawyer believes that opposing counsel's conduct raises a substantial question about his honesty, trustworthiness, or fitness to practice, then the lawyer should report the other lawyer's misconduct to the disciplinary counsel." Pennsylvania Ethics, Op. 89-247 (undated). It is unclear from the materials available, however, whether the word "believed" refers to the legal conclusion whether the conduct is a violation or to the factual conclusion whether the conduct occurred.
Just recently the District of Columbia Bar adopted the position that a lawyer is compelled to report "only if she has a clear belief that misconduct has occurred, and possesses actual knowledge of the pertinent facts." D.C. Bar, Op. 246 (Revised 1994).
An excellent discussion of "knowledge" in the context of the Rules of Professional Conduct can be found in The Law of Lawyering by Geoffrey C. Hazard, Jr., and W. William Hodes. Section 402 states:
In the final analysis, all conclusions about someone else's state of mind must be derived from circumstantial evidence. Where a rule provides that a lawyer "reasonably should have known," the reference is to circumstances that would lead to awareness on the part of reasonable people with a lawyer's training. But circumstantial evidence must also be the basis for inferring a lawyer's actual knowledge or belief, where that is the relevant legal standard. It is impossible to look into a lawyer's head, and it is unacceptable simply to take his word for his state of mind when the probity of his own conduct is at issue. As the Terminology section points out, a person's belief or knowledge "may be inferred from circumstances."
This practical method of proof has enormous significance. Even where a violation requires "knowledge," the circumstances may be such that a disciplinary authority will infer that a lawyer must have known. In such a case the lawyer will be legally chargeable as if actual knowledge had been proved. In terms of what can be proved, the "knows" standard thus begins to merge with the "should have known" standard, for often it will be impossible to believe that a lawyer lacked knowledge unless he deliberately tried to evade it. But one who knows enough to evade legally significant knowledge already knows too much.
Geoffrey C. Hazard, Jr., and W. William Hodes, The Law of Lawyering § 402 (1993).
Hazard and Hodes write of a lawyer's unbelief as opposed to his knowledge:
Although his professional role may require a lawyer to take a detached attitude of unbelief, the law of lawyering does not permit a lawyer to escape all accountability by suspending as well his intelligence and common sense.
... [A]ll authorities agree ... that there comes a point where only brute rationalization, moral irresponsibility, and pure sophistry can support the contention that the lawyer does not "know" what the situation is.
Id., at § 403.
Here is the Hazard and Hodes pragmatic approach to knowledge:
[A] lawyer's conduct will be assessed according to a legal standard that assumes a lawyer can "know" the truth of a situation, even if he cannot be absolutely sure. Even the criminal law, after all, does not require absolute certainty; it requires only a conclusion that is beyond a reasonable doubt. As noted in § 402, the law of lawyering as set forth in the Terminology section of the Rules of Professional Conduct permits a disciplinary authority to "infer from circumstances" that a lawyer knows what a reasonable person would know. More than this, the law takes account of a lawyer's legal training and experience in assessing his or her state of mind. A lawyer is an adult, a man or a woman of the world, not a child. He or she is also better educated than most people, more sophisticated and more sharply sensitized to the legal implications of a situation. The law will make inferences as to a lawyer's knowledge with those considerations in mind.
Looking forward into his professional conduct as it proceeds, a lawyer must imagine how his conduct will appear to *972 others, later looking back at it. And he must imagine the inferences that will be drawn as to what he must have known at the time. In pragmatic terms, this is what a lawyer knows.
Id., at § 404.
U would have this court define "actual knowledge" as "personal knowledge". Only if a lawyer had such knowledge as would enable him to testify as a witness that a another lawyer had violated the Rules of Professional Conduct would he have to inform the proper authorities. We believe that a higher standard may be fairly inferred to be required. That standard must be an objective one, however, not tied to the subjective beliefs of the lawyer in question. The supporting evidence must be such that a reasonable lawyer under the circumstances would have formed a firm opinion that the conduct in question had more likely than not occurred and that the conduct, if it did occur, raises a substantial question as to the purported offender's honesty, trustworthiness or fitness to practice law in other respects.

c.
The circumstances under consideration here reflect that U's client told him of an arrangement which appeared to be fee splitting. The record tells us nothing concerning corroboration of the client's story or of the client's trustworthiness. The other party to the purported arrangement denies that it existed. These circumstances do not dictate a firm opinion on the part of a reasonable lawyer that the conduct in fact occurred.
It is suggested that the fact that the lawyer relied upon what he was told by his client to assert the client's claim is significant. The fact that in one of the affidavits U states that he "learned" of the fee splitting arrangement is also fastened upon as supportive of a finding of a violation. A moment's reflection would reveal the fallacy of these arguments.
It is not for the lawyer to believe or disbelieve the client. Ultimately, it is for the factfinder, either judge or jury. A lawyer must be free to assert his client's claims, at least until there is evidence apparent that the client is lying. The state of mind necessary to assert the claim, however, falls well short of that required for a "firm opinion" as to whether specific conduct occurred. We must allow lawyers at least this degree of detachment if we are to assure the competent and vigorous representation essential to our adversary system of justice.
As to the affidavit, the argument is semantical. It is clear from all that has been introduced in this case, that the evidence of an improper arrangement is confined to the unsworn description of a client. U clearly denied knowing of such an arrangement by any other means. Indeed, in the same paragraph in which he said he "learned" he referred to it as an "alleged" agreement. This is clearly not an admission of personal knowledge. Neither is it an admission of a firm opinion.
As measured by the standard we announce here, the proof falls short of that necessary to demonstrate by clear and convincing evidence that lawyer U had sufficient evidence before him such that any reasonable lawyer would have formed a firm opinion that the conduct alleged by his client had in fact occurred.
Because we conclude that the evidence was insufficient to support a finding of "knowledge" we need not reach the issue whether the alleged entry into a fee-splitting arrangement, which was apparently renounced before any fees were actually split, was conduct bearing on S's honesty, trustworthiness or fitness to practice law. We pause only to note that a lawyer is not obliged to report every transgression of our disciplinary rules, only the most serious of them. M.R.P.C. Rule 8.3(a), Comment.
Whether a particular violation of the disciplinary rules meets the "substantial question" test must be determined on a case-by-case basis, using "a measure of judgment" rather than a clear litmus test. Advisory opinions from other jurisdictions are somewhat helpful in this regard but suggest no bright line test. Compare Arizona Op. 87-26 (failure to file tax returns should have been reported), Alabama Op. 90-97 (same for misappropriation of escrow funds), and New Mexico Op. 1988-8 (same for attempt to bribe witnesses); *973 with Illinois Op. 90-36 (threats to bring criminal charges to gain advantage in a civil suit need not be reported), Virginia Op. 962 (1987) (same for attempt to persuade clients to change wills to detriment of Society for the Prevention of Cruelty to Animals), and Pennsylvania Op. 88-225 (same for failure to comply with statute of limitations).
D.C. Bar, Op. 246.
There are cases and opinions from other jurisdictions dealing with the question of fee-splitting. Where substantial sanctions are imposed, the fee-splitting transgression is usually attended by other misconduct. It should suffice to say, however, that the sanction to be imposed in a particular case will depend upon all of the attendant circumstances. State Bar of Texas v. Faubion, 821 S.W.2d 203 (Tex. Ct. App. 1991); In the Matter of an Anonymous Member of the South Carolina Bar, 295 S.C. 25, 367 S.E.2d 17 (1988); The Florida Bar v. Stafford, 542 So.2d 1321 (Fla. 1989); In the Matter of Elias Quintana, 104 N.M. 511, 724 P.2d 220 (1986); In re Clarence A. Potts, 301 Or. 57, 718 P.2d 1363 (1986); Committee on Professional Ethics and Conduct of the Iowa State Bar Ass. v. Lawler, 342 N.W.2d 486 (Iowa 1984); Office of Disciplinary Counsel v. Jackson, 536 Pa. 26, 637 A.2d 615 (1994); In the Matter of Charles E. Houston, 314 S.C. 94, 442 S.E.2d 175 (1994); and In the Matter of Theodore Friedman, 196 A.D.2d 280, 609 N.Y.S.2d 578 (1994).

III.
Having found that U never had a Formal Complaint filed with the Clerk of this Court to pursue charges against him for violation of M.R.P.C. 1.16(a), or 1.2(d), the issue regarding the "threats of a bar complaint to exact a settlement" was not previously and is not now properly before the Court. Additionally, to institute disciplinary proceedings at the appellate level raises glaring due process concerns. See In the Matter of Richard Thalheim, Jr., Plaintiff-Appellant, 853 F.2d 383, 388 (5th Cir.1988); The Mississippi Bar v. Attorney G, 630 So.2d 344, 348 (1994). Accordingly, there is no issue requiring remand, and instead the Court is required to render this aspect of the case.
A significant amount of time has elapsed since this dispute began, and this opinion is the final word in the charges, counter-charges, hearings and findings which have occurred. The time has come to put an end to this matter once and for all. We do not in any manner condone the alleged acts of U, but are required to construe the disciplinary rules strictly. Therefore, U will not have any more disciplinary proceedings instigated against him with regard to the issues already addressed by this Court or originally found to be lacking probable cause by the Complaints Committee absent a reinstitution of proceedings by the Bar Complaints Committee. It is hoped that similar cases shall not arise. Those so tempted would be better served by persistent and continual study of the Mississippi Rules of Professional Conduct. The conclusion of this case is based upon its peculiar history, as are all cases, and its very close decision affords little comfort to those who may be similarly situated.

IV.
For the aforementioned reasons, the judgment of the Complaint Tribunal is reversed and this matter is rendered consistent with this opinion.
REVERSED AND RENDERED.
DAN LEE, C.J., PRATHER, P.J., PITTMAN and SMITH, JJ., concur.
MILLS, J., concurs in result only.
BANKS, J., concurs in part and dissents in part with separate written opinion joined by SULLIVAN, P.J., and McRAE, J.
McRAE, J., dissents with separate written opinion.
BANKS, Justice, concurring in part and dissenting in part:
I agree that the reprimand imposed by the complaint tribunal should be rejected for the reasons expressed in my original majority, most of which is reiterated by today's majority. In my view, however, the fact that a complaints committee has failed to authorize *974 a formal complaint on the charge of wrongfully threatening to file a bar complaint in order to gain an advantage is no bar to subsequent proceedings on such a charge. Accordingly, I dissent from today's resolution of this matter and adhere to the views expressed in the original majority opinion.[1] I would remand the matter for further proceedings, including at least, the presentation of the facts anew to the Committee on Professional Responsibility (hereinafter "CPR").
I cannot quarrel with the pronouncement in Smith v. Miss. State Bar, 475 So.2d 148 (Miss. 1985), to the effect that our law allows no appeal from a failure of the CPR (then the State Bar Committee on Complaints) to authorize the filing of a formal complaint. Nor do I question the suggestion that if we are to sanction attorneys for misconduct we must do so in accordance with our rules. Id. at 149-150. Nothing in our Rules of Discipline or in Smith, however, prohibits the reinstitution of proceedings which have not progressed beyond the CPR stage. Clark v. Mississippi State Bar Ass'n, 471 So.2d 352, 357 (Miss. 1985) (Prior dismissal of charges by complaints committee is not res judicata because it is not judicial determination on the merits but "rather is analogous to a review by a grand jury.")
There may be due process and fundamental fairness concerns arising out of repeated presentations of charges originally retired to the files but none appear in the instant case. This is not an instance of harassment at the behest of an overzealous bar counsel but rather a resumption of proceedings generated by the presentation of evidences to this Court through a formal complaint on a different charge. This Court hears such matters de novo and is the ultimate authority with regard to lawyer discipline. Its direction to pursue a matter further cannot, without more, be viewed as harassment. On these facts, I see no due process or fundamental fairness violation. To the extent that one can be shown, it should be alleged and supported before a complaint tribunal should a formal complaint be authorized by the Committee on Professional Responsibility.
Finally, I am not impressed with the suggestion that because the conduct in question occurred some time ago, we should simply end it now. It is not unusual for bar proceedings to be extended. See e.g. Barrett v. Mississippi Bar, 648 So.2d 1154 (Miss. 1995) (a complaint was filed in 1982 and was resolved by this Court on January 12, 1995); Miss. State Bar v. Blackmon, 600 So.2d 166 (Miss. 1992) (proceedings began on April 23, 1986, and were concluded by this Court on April 15, 1992). Indeed we have noted that disciplinary proceedings should be pursued at a cautious pace. Myers v. Mississippi State Bar, 480 So.2d 1080 (Miss. 1985). To be sure, it is in the interest of both the public and practitioners that these matters not be unduly prolonged. The mere passage of time, especially during the pendency of complaints, however, has not been and should not be deemed sufficient to excuse attorney misconduct from the reach of our disciplinary scheme. Barrett v. Mississippi Bar, 648 So.2d at 1160. In Myers we were unclear as to where proceedings should begin on remand to consider previously uncharged conduct. Myers v. Mississippi State Bar, 480 So.2d at 1091. In The Mississippi Bar v. Attorney G, 630 So.2d 344, 348 (Miss. 1994), our mandate pretermitted presentation to the CPR and directed a hearing before the complaint tribunal. Our original mandate here remanded the matter to a complaint tribunal. Out of deference to our rules and the due process implications of ignoring them, I am willing to concede that a formal complaint directed by the CPR is the better *975 practice. Technically, then, the majority may be correct. Starting at that point may require no remand. I wish to leave no doubt at all, however, that I consider the charge here discussed alive and well, fully capable of presentation in the manner prescribed by the rules.
SULLIVAN, P.J., and McRAE, J., join this opinion.
McRAE, Justice, dissenting:
The Complaint Tribunal properly found that Attorney U violated Rule 8.3 of the Rules of Professional Conduct. At the very least, the Tribunal's modest sanction of a public reprimand should be affirmed, and the matter referred to the Bar for further action on Attorney U's threatened blackmail of Attorney S. To let Attorney U emerge unscathed and unsanctioned for his misdeeds reflects the majority's unabashed bias in favor of partners in major Jackson law firms.
The majority's finding that Attorney U had no knowledge that Attorney S was engaged in a fee-splitting arrangement with McNeese and PFL is incredible. Rather than insulting our intelligence, the majority should simply repeal a rule it so obviously dislikes. Better yet, why not discard the Rules of Professional Conduct altogether? Accordingly, adopting much of the language used in the original dissent to this opinion as authored by retired Chief Justice Armis Hawkins, I dissent.
We are faced with a most egregious set of facts wherein one attorney attempted to use the threat of a bar complaint to induce another to extract from more than 1,000 asbestosis claimants fees of $4,000.00 apiece for a test that cost other people only about $400.00. Moreover, he used the threat of a bar complaint to sidestep any possible expose to liability for a breach of contract action. Despite this attempt to extort more than four million dollars from our hardworking citizens, the majority pays lip service to our Rules of Professional Conduct and allows the offending attorney, a partner in a distinguished Jackson law firm whose members include a former president of the Bar Association, to walk away without so much as a slap on the hand.[1] Would we be so quick to merely wink at even a minor indiscretion and spare the heavy hand were the offending party a small-town sole practitioner? I fear not.

I.
Admission to the Mississippi Bar carries with it privileges as well as solemn responsibilities. Only Bar members may sign pleadings, represent clients in court, or hold themselves out as attorneys. One of membership's greatest privileges is being a part of a self-regulating profession. Members of the Bar decide who is to be admitted and, when an attorney's conduct warrants it, who is to be sanctioned. Only those worthy of calling themselves lawyers will be allowed to do so. However, self-regulation is also a duty. Every member of the Bar, whether practicing alone in a small town or a senior partner of a large, prestigious Jackson firm, is entrusted to maintain the profession's high standards. The Rules of Professional Responsibility provide criteria by which we shall conduct ourselves. Nevertheless, without enforcement by the members of the Bar, the Rules are meaningless. Without the Rules, the integrity of the profession collapses.
Rule 8.3(a) provides the linchpin for self-regulation:
A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.
The Comment to the Rule explains, "[t]he term `substantial' refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware." Furthermore, the Random House Unabridged Dictionary variously defines "knowledge" as "acquaintance with facts, truths or *976 principles, as from study or investigation ..." or "acquaintance or familiarity gained from sight, experience or report ..." or "that which is or may be known; information." The same dictionary defines "inform" as "to impart knowledge of a fact or circumstance." In contrast, it defines "ignorant" as "lacking knowledge or information as to a particular subject or fact" or "uninformed; unaware." Finally, it defines "learn" as "to become informed of or acquainted with."
Rule 8.3(a), which every member of the Bar has sworn to uphold, makes each attorney a policeman of the profession. The rationale behind this rule is simple  no one is better suited to recognize a breach of the Rules or better situated to observe one. The gravamen of Rule 8.3(a) is such that if its precepts are not enforced, the Bar's hallowed concept of self-regulation will become a pathetic mockery. It applies to all who call themselves lawyers  sole practitioners and large firm partners alike. The majority, however, would have us not only reduce the rule to a shadow, but vanish the shadow as well.
Actual knowledge is required to satisfy Rule 8.3(a), but actual knowledge can be, and indeed often must be, inferred. If it is possible to infer by circumstances and prove by clear and convincing evidence that Attorney A, as a reasonable attorney, knew that Attorney B had violated the Rules of Professional Conduct, then Attorney A should be held to have sufficient knowledge of Attorney B's wrongdoing to warrant the imposition of sanctions under Rule 8.3(a). Thus, Attorney A must have more than a mere suspicion of Attorney B's unprofessional conduct; he cannot ignore his own common sense and legal training. The majority, however, states:
Th[e] standard must be an objective one, not tied to the subjective beliefs of the lawyer in question. The supporting evidence must be such that a reasonable lawyer under the circumstances would have formed a firm opinion that the conduct in question had more likely than not occurred and that the conduct, if it did occur, raises a substantial question as to the purported offender's honesty, trustworthiness or fitness to practice law in other respects.
This standard replaces the vague term "actual knowledge" with the equally vague term "firm opinion." Thus, the majority provides an attorney with no further insight as to what is required of him under Rule 8.3(a). Moreover, semantics aside, the record indicates that Attorney U actually knew of Attorney S's misconduct.

II.
At issue is whether Attorney U knew of Attorney S's fee-splitting arrangement with PFL in violation of Rule 5.4(a). An examination of the record shows that he did.
PFL was a laboratory engaged in performing pulmonary function tests upon people who had been exposed to asbestos. William T. McNeese,[2] one of the owners of PFL, and Attorney S entered into an agreement in 1988 whereby Attorney S and PFL would split $175 of the $400 laboratory fee charged to each of Attorney S's clients. There would be a further split in the fee Attorney S received under his contingency contract with the client. As so often happens in such a scheme, McNeese decided in 1989 that he was not getting a big enough piece of the pie, and approached Attorney U.
McNeese first presented Attorney U with a proposed written contract providing for a splitting of legal fees. Attorney U told McNeese that such a contract would be unenforceable because it violated the Rules of Professional Conduct. McNeese then informed Attorney U that PFL and Attorney S had been operating under a verbal fee-splitting agreement for several months, but now Attorney S was denying its existence and disputing the amount owed. McNeese also told Attorney U that Frank Trapp, S's attorney in the dispute, had suggested a flat fee arrangement, but the parties were unable to agree on the amount PFL would be paid.
Attorney U was aware that such a fee-splitting agreement violated Rule 5.4(a) of *977 the Rules of Professional Conduct.[3] Once informed of his conduct, Attorney U acquired actual  not circumstantial  knowledge of the breach. Attorney U was not informed merely of suspicious circumstances from which he might reasonably conclude that unethical conduct had occurred, but had received clear-cut information from McNeese that Attorney S had entered into a fee-splitting agreement with PFL.
The only question facing Attorney U was the reliability of the knowledge he had gleaned from McNeese. To fulfill his obligation as a responsible attorney, Attorney U had several ethical options: If he considered the information unreliable or unbelievable, he could ignore it. If he considered the information trustworthy, he could prevail upon Attorney S to admit or deny it, provide him with opportunity to respond, and, depending upon the credibility of the response, either drop the matter or inform the appropriate authorities. Finally, if he considered the information related by McNeese trustworthy, Attorney U simply could report the conduct.
Attorney U, however, had a much better idea. Obviously he could not force Attorney S to pay PFL as the two had agreed, because their agreement was illegal and void. Nor did he have any legal basis to require Attorney S to sign any new contract, and certainly not one with such an outrageous lab fee. But, aha! He did have something. He could scare Attorney S into signing a contract by threatening him with suspension or disbarment from practicing law. Blackmail.
According to the majority's logic, however, Attorney U knew enough to attempt baldfaced blackmail, yet somehow had insufficient knowledge to report Attorney S's conduct to the Bar. Consider the evidence in the record now before us.
On October 10, 1989, Attorney U wrote Trapp a letter threatening Attorney S with complaint proceedings before the Bar unless Attorney S met their terms. Having sufficiently relied upon the facts relayed to him by McNeese in his attempt to blackmail Attorney S, Attorney U now is estopped from asserting he had no knowledge of the agreement. The record indicates that McNeese had furnished Attorney U with detailed information: his October 10 letter to Trapp tells him that since February 19, 1988, some 1,061 clients of Attorney S had been given pulmonary tests by PFL; PFL (McNeese) had agreed to finance all medical costs for testing; and upon recovery, PFL would be reimbursed its medical costs and paid one-half of Attorney S's fees. Attorney U advised Trapp that this violated Rule 5.4(a) of the Rules of Professional Conduct. He then wrote Trapp that his client wanted $4,000 from Attorney S from each client, and that this "compensation will be significantly less than it would have been under the verbal fee sharing arrangement ..." Finally, Attorney U wrote:
I have advised Pulmonary Function Laboratory of the availability of the complaint proceedings available through the Mississippi Bar Association. Unless something can be worked out along the lines of this proposal, it is the intention of Pulmonary Laboratory to seek relief through whatever legal avenues are available to it.
Nevertheless, Attorney U had the audacity to claim he had never threatened Attorney S.
On October 27, Attorney U again wrote Trapp regarding the negotiations in progress and what PFL expected from Attorney S. In his response, Trapp advised Attorney U "without admitting or conceding any arrangement ever existed," that his client now "renounces" any such arrangement. On November 17, Attorney U retorted, informing Trapp that he and PFL had no intention of letting Attorney S get by with any kind of *978 prevarication as to a fee-splitting agreement: "PFL has advised me that they have no intention of renouncing the fact that there was a fee-sharing arrangement between them and [Attorney S]." Attorney U's letter further stated:
As you know, I have advised PFL of its options, including the availability of the complaint proceedings available through the Mississippi State Bar Association. Again, unless something can be worked out along the lines of a negotiated flat fee arrangement, it is the intention of PFL to seek relief through whatever legal avenues are available to it.
Please discuss this with [Attorney S] and inform us of his decision. If we have not received a response from [Attorney S] by November 27, 1989, our clients will perform no further retesting on [Attorney S]'s clients and will pursue whatever legal remedies it considers appropriate.
Of course, if Attorney S had succumbed to the blackmail, neither the Bar nor this Court would have been the wiser. This fee-splitting contract between PFL and Attorney S forever would have been swept under the rug. No one would have known. Attorney S did not cave in, however, and Attorney U made yet another more ominous threat in his December 1st letter to Trapp. In closing, he wrote:
This matter has now drug [sic] on for some time. We have been instructed to obtain the necessary forms from the Mississippi State Bar Association for Pulmonary Function Laboratory to proceed with a bar complaint against [Attorney S].
Trapp's final letter to Attorney U on December 6 told him that Attorney S was unwilling to play along. He advised Attorney U that the proposed charge of $4,000.00 per client for laboratory services was exorbitant, far above the $423.00 charge to clients of other attorneys. Further, letting Attorney U know in no uncertain terms that his actions amounted to outright blackmail, Trapp's letter concludes:
Everyone recognizes the arrangement alleged by Mr. McNeese would be an unenforceable contract. Moreover, that alleged arrangement runs afoul with the spirit of the runner and champerty statutes. Thus it is clear Mr. McNeese's demand for $4,000 per client is either (1) to pay blackmail to keep Mr. McNeese from filing a complaint with the bar association or (2) to pay Mr. McNeese for allegedly referring clients to [Attorney S]. In either case, the payment would be illegal.
Over the past several weeks, I had talked with [the associate] (a member of Attorney U's law firm) about the situation. I reiterated [Attorney S]'s disavowal of the arrangement alleged by Mr. McNeese... .
Your letter of December 1, 1989, is a unilateral rejection of our good faith effort to come up with a fair fee schedule. Your letter does not state what figure you are referring to that is "significantly above the [$423 quote]." I only assume it is another effort to extract some excessive fee from [Attorney S]. Any payment on that basis would not be legitimate. I cannot advise my client to agree with any fee schedule which is only a guise for an illegal payment.
Was Trapp's assessment accurate? Yes. First, it is apparent that Attorney U was not attempting to sue for the breach of some enforceable contract, or to make Attorney S pay some sum which he legally owed PFL. No, his sole purpose was to extort from Attorney S an obligation to pay a fee for which he otherwise was not liable in any shape, form or fashion under the law. It was, pure and simple, as Trapp characterized it, blackmail. Trapp did not buy it.
There was no further correspondence. Instead, true to Attorney U's threat, McNeese followed through by filing a Bar complaint against Attorney S in January, 1990.
A year later, Attorney S, in turn, filed a bar complaint against Attorney U. Thereafter, the Bar filed a motion for summary judgment, followed by a cross-motion for summary judgment filed by Attorney U.
Because of the legal shenanigans revealed within, the affidavits of both Attorney U and McNeese should not go unnoted:
Attorney U's affidavit of February 18, 1991, states:

*979 2. When my firm and I were first engaged by Mr. Bill McNeese of Pulmonary Function Laboratory (PFL) we were asked to review a proposed fee-splitting agreement between PFL and one or more unidentified attorneys. This was in August 1989. I did not learn at that time that PFL was supposedly operating with any attorney under any such agreement.
3. We expressed our professional opinion about the agreement furnished to us by PFL for review. We prepared a substitute agreement for a contingent fee arrangement between PFL and certain individuals for whom PFL proposed to do testing and to render other services.
12. I never threatened or coerced either [Attorney S] or his attorney. I never sought to extort anything from either of them. I never told Mr. Trapp or [Attorney S] of any intent to file a bar complaint except as stated in my letters which are exhibits to the complaint.
13. I certainly never personally threatened or otherwise said that I would file a bar complaint against [Attorney S] because I have never known to my personal knowledge that he committed any violation of the Rules of Professional Conduct. In any event, PFL, the party claiming such conduct on the part of [Attorney S], filed a complaint against him within ninety (90) days of telling me of its complaint against [Attorney S].
14. I have not sought at any time material hereto to induce anyone to commit any crime or to violate the Rules of Professional Conduct of the Mississippi State Bar and I have not done so myself.
McNeese's affidavit of February 14, 1991, states:
4. In the course of my discussions with [Attorney U] and [the associate] about the ethical prohibitions of [Attorney S] entering into a fee-splitting arrangement with PFL, as PFL contended he had done, [Attorney U] advised me that if, in fact, such an agreement had existed, it might be the basis for a complaint with the Mississippi State Bar Association against [Attorney S] by PFL.
5. At no time prior to PFL filing a bar complaint against [Attorney S] did [Attorney U] encourage PFL to file such a bar complaint, nor did [Attorney U] advise PFL that it should use the threat of a bar complaint as a means of forcing [Attorney S] to resolve the differences between he and PFL.
6. Once PFL realized that it had the basis for a bar complaint against [Attorney S], it was my intention to file such a bar complaint... .
7. The first suggestion to PFL that a flat fee agreement might be entered into between [Attorney S] and PFL, in lieu of the prior contingency fee agreement, was made to me by the attorney for [Attorney S]. The $4,000.00 flat fee proposal made on behalf of PFL to [Attorney S] suggested in [Attorney U's] letter to Mr. Frank Trapp of October 27, 1989, was in lieu of the former agreement and was for services to be provided by PFL over and above the usual pulmonary function testing provided in such cases. (Emphasis in original.)
Neither the majority nor I know for certain, even at this late date, whether such a fee-splitting agreement in fact ever existed, but if there was such an agreement, we acquired actual knowledge of its existence when we examined the record submitted to us on appeal. Likewise, Attorney U acquired actual notice or knowledge of such an agreement when he "learned" of it in September, 1989 from his client, McNeese.
Upon learning such information from one's client, an ethical attorney has the obligation either to report it or to call upon the other attorney for a denial or explanation, advising him that he has a duty to report the conduct. Attorney U chose neither of these salutary courses. Rather, he chose blackmail to extort an agreement from Attorney S to which the latter could not be legally obligated, and in the absence of such threat, would no doubt have told Attorney U to take a hike.
What were Attorney U's letters to Trapp if not threats? And his claim that he never knew to his "personal knowledge" of any violations? He knew enough to attempt blackmail, which he obviously believed or he would never have risked accusing the attorney *980 of it.[4] This Court has chosen to ignore the evidence and Attorney U's transgressions. In so doing, it has stripped Rule 8.3(a) of all meaning.
How can the majority assert that a lawyer placed sufficient reliance on information furnished to him by his client to blackmail another attorney, but did not have sufficient knowledge to relay that information to the Bar? Ordinary people are found guilty beyond a reasonable doubt and sentenced to decades in prison on less proof than this. One wonders what it would take to prove to the majority that Attorney U knew of the fee-splitting arrangement.
Take your pick or select them all. Under every authority quoted in the majority opinion, Attorney U hit the bull's eye. There can be no question but that his client, McNeese, told him of the fee-splitting contract between Attorney S and PFL, and that he believed it. How else could he have accused Attorney S and so doggedly threatened him with a lawsuit?
The majority tells us that "the other party to the purported arrangement denies that it existed." To find such a denial in this case, one must go outside the record. Trapp certainly did not deny that such an agreement had ever been made by his client. He was too good a lawyer for that: he pled nolo contendere. Curiously, the majority further instructs:
It is not for the lawyer to believe or disbelieve the client. Ultimately, it is for the fact finder, either judge or jury. A lawyer must be free to assert his client's claims, at least until there is evidence apparent that the client is lying. The state of mind necessary to assert the claim, however falls well short of that required for a "firm opinion" as to whether specific conduct occurred. We must allow lawyers at least this degree of detachment if we are to assure the competent and vigorous representation essential to our adversary system of justice.
The majority also contends that the fact that Attorney U wrote letters to Trapp, accusing Attorney S of conduct which could cost him his license to practice law, does not mean anything. It says, "Lawyers do that all the time." Does the majority really believe this? Has the majority not read Rule 11 of the Mississippi Rules of Civil Procedure? Moreover, practically speaking, I have never met an attorney, and doubt very seriously that I will ever meet one, who makes idle threats based upon information he does not believe. Only a very naive lawyer would write a letter threatening to file suit based on facts he, himself, did not believe. Even more fatuous is the majority's conclusion that Attorney U did not necessarily believe McNeese's detailed description of the fee splitting arrangement with Attorney S. He just "believed" it enough to attempt blackmail. Strange routes are taken by the majority in its apologia for Attorney U's conduct and its protection of old, established Jackson law firms.

III.
Finally, the majority finds that it is required to render the issue of charges that Attorney U also violated Rule 1.16(a) or 1.2(d) on grounds that the issue of using "threats of a bar complaint to exact a settlement" was not properly before us since no formal complaint had been filed with the Clerk of this Court on that charge. I thought that we reviewed attorney discipline cases de novo. Mississippi State Bar v. Young, 509 So.2d 210, 217-218 (Miss. 1987). Attorney U was treated with utmost leniency by the Complaint Tribunal, which levied only the sanction of a public reprimand against him. He would not have lost a single day or a single dollar in his law practice. Totally oblivious to any wrongdoing on his part, however, and with not a kernel of contrition for all he did, Attorney U appeals to this Court, expressing outrage at the injustice done him. *981 And the majority concurs, forbidding even a slap on the wrist.
In recent years we have seen the public's trust in the legal profession erode to almost nothing. With this case, however, we might have been able to show that the legal profession is so committed to policing itself that it will punish those who do not assist in this goal, regardless of the stature or prestige of the offending attorney's practice and reputation. Opportunities to prove oneself worthy of another's trust are extremely rare. The facts in this case are clear  Attorney U did know of the illicit fee-spitting arrangement between an attorney and his client, a non-attorney, and did not report it. The law is clear as well  not only are attorneys required to act in professional manner, they also are required by Rule 8.3(a) to report conduct of other attorneys which they know has violated the rules. Today's result should therefore be no less straightforward  Attorney U should be sanctioned. If attorneys are to be self-regulating and have their own Rules of Professional Conduct, these rules must be enforced, especially those designed to aid in self-regulation. A true profession can do no less.
Obviously, membership has its privileges. I would affirm the sanction, and remand for a hearing on what clearly was blackmail as we originally ordered. Accordingly, I dissent.
NOTES
[1] Several portions of Justice Bank's original majority opinion have been used verbatim, as those portions accurately explain the procedural history and facts involved.
[1] The following is an excerpt from the original majority opinion, most of which remains as today's majority as noted in the majority opinion, ante p. 964 n. 1.

The more troublesome conduct apparent from the exhibits in this case is the rather obvious use of the threat of a bar complaint in an effort to secure a favorable settlement. U denies an intent to do so but his letters appear to be amenable to that conclusion. D.C. Bar, Op. 220 (1992); Ill. Bar, Op. 87-7 (1988); Ind. Bar, Op. 10 (1985); Me. Bar, Op. 100 (1989); Md. Bar, Op. 86-14 (1985); Mass. Bar, Op. 83-2; Mich. Bar, Op. CI-695 (1981); Wis. Bar, Op. E-89-16 (1989).
This is conduct not charged here, however. We, therefore, remand this matter to the Complaint Tribunal for further proceedings with regard to this issue. Myers v. Miss. State Bar, 480 So.2d 1080, 1091 (Miss. 1985).
[1] We can only speculate as to what sort of fee agreement Attorney U might have had with McNeese. Because the majority has elected to sweep his transgressions under the carpet, we will never know.
[2] McNeese was the former business agent for a large union and part owner of PFL, a laboratory set up for the sole purpose of screening asbestosis claimants seeking to recover against manufacturers doing business in Mississippi.
[3] Rule 5.4(a) of the Mississippi Rules of Professional Conduct provides:

(a) A lawyer or law firm shall not share legal fees with a non-lawyer, except that:
(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;
(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer; and whole or in part on a profit-sharing arrangement.
[4] The use of the words "personal knowledge" is an interesting exercise in semantics. If Attorney U meant he did not personally witness the fee splitting arrangement between Attorney S and PFL, he was saying no more than the obvious, something the tribunal already knew. On the other hand, if he meant anything less, in the absence of discarding every dictionary in the English language, clearly he had "personal knowledge." He was specifically informed by his client.